1998-NMSC-038

967 P.2d 827

**In the Matter of Staff's Petition for Order to Show Cause Why Plains Electric Generation and Transmission Cooperative, Inc.'s Transactions Involving McKinley Paper Company Do not Violate the Public Utility Act,**

**PLAINS ELECTRIC GENERATION AND TRANSMISSION COOPER-ATIVE, INC., Appellant,**

v.

**NEW MEXICO PUBLIC UTILITY COMMISSION, Appellee.**

No. 23816.

Supreme Court of New Mexico.

Oct. 8, 1998.

Rehearing Denied Nov. 5, 1998.

Carpenter & Nixon, L.L.P., Richard N. Carpenter, Sunny J. Nixon, Santa Fe, for Appellant.

New Mexico Public Utility Commission, Lee W. Huffman, Santa Fe, for Appellee.

Cohen & Cohen, P.A., David S. Cohen, Robert Y. Hirasuna, Santa Fe, for Amicus El Paso Electric Company.

Keleher & Mcleod, P.A., Robert H. Clark, Gary J. Van Luchene, Albuquerque, for Amicus Public Service Company of New Mexico.

Rubin, Katz, Salazar, Alley & Rouse, P.C., Donald M. Salazar, Serina M. Garst, Santa Fe, for Amicus Texas New Mexico Power Company.

Tom Udall, Attorney General, Charles F. Noble, Jeff Taylor, Assistant Attorneys General, Santa Fe, for Amicus New Mexico Attorney General.

Steven S. Michel, Santa Fe, for Amicus New Mexico Industrial Energy Consumers.

## OPINION

SERNA, Justice.

{1} Plains Electric Generation and Transmission Cooperative, Inc. (Plains) appeals from the Final Order of the New Mexico Public Utility Commission [1] (Commission)

1. In 1993, the Legislature redesignated the Public Service Commission as the Public Utility

in Case 2522. The Commission fined Plains $8000 and suspended an additional fine of $72,000, subject to compliance with the Final Order, for violations of specific provisions of the New Mexico Public Utility Act (PUA), NMSA 1978, §§ 62–1–1 to 62–13–14 (1984, as amended through 1996, prior to 1999 amendment). *See* NMSA 1978, § 62–9–5 (1983, repealed effective July 1, 2003) (abandonment of service); NMSA 1978, § 62–6–19(B)(2) (1982) (authorizing Commission investigation of Class II transactions); *see also* Affiliate Transactions, NMPUC Rule 450.7 (1989) (requiring prior written Commission approval of a general diversification plan in order for a utility to engage in Class II transactions).

{2} We address the following issues: (1) whether Plains' conveyance of land for the McKinley Paper Company (MPC) site without prior Commission approval constituted an abandonment of a "facility" in violation of Section 62–9–5; (2) whether Plains' investment in building non-utility facilities for MPC in exchange for MPC's promise to reimburse Plains over time through charges for steam and water service constituted a Class II transaction, as defined by NMSA 1978, § 62–3–3(K)(3) (1993, prior to 1996 & 1999 amendments), for which prior Commission approval was required under Rule 450.7; (3) whether Plains' investment in Satellite Connection (SatCon), a division of Plains, was also a Class II transaction requiring prior Commission approval; and (4) whether the Commission correctly determined that Plains violated its Certificate of Convenience and Necessity (CCN) when it provided or agreed to provide non-utility services to MPC. We conclude that the Commission relied on improper findings and conclusions with respect to all four issues. Thus, we do not address Plains' argument that the Commission's Final Order constitutes impermissible retroactive adjudicatory rulemaking. We annul and vacate the Final Order.

Commission. NMSA 1978, § 62–5–4 (1993). *See generally* NMSA 1978, § 62–3–3(B) (effective Jan. 1, 1999) (reclassifying a reorganized Commission as the Public Regulation Commission).

## Facts and Background

{3} Plains is a cooperative membership corporation that provides wholesale electric service to its thirteen members, who then resell the electric services to the public. The Commission regulates the rates Plains charges public utilities for the purchase and delivery of electric service. The Plains Escalante Generating Station (PEGS), which produces most of Plains' electricity, occupies between 600 and 700 acres of a 2564–acre site. Although within the rate base, most of the total acreage is vacant land. Plains conveyed 41 acres of vacant land within the PEGS site to McKinley County for $51,000; McKinley County then leased the land to MPC, which constructed a plant to manufacture recycled liner board. The Commission found that Plains' conveyance of the 41 acres constituted abandonment of utility facilities without prior approval in violation of Section 62–9–5.

{4} One of the issues before this Court is whether Plains engaged in Class II transactions with respect to agreements with MPC, a New Mexico corporation owned by Australian Paper Manufactures. Plains, Australian Paper Manufactures, and one of Plains' distribution members, Continental Divide Electric Cooperative, Inc., reached several agreements concerning MPC. Plains, at its own expense, agreed to construct facilities, including a backup steam boiler and transmission facilities, for the use and benefit of MPC. Plains also agreed to provide non-utility services to MPC, including the provision of steam and 450 acre feet of water annually. Continental Divide Electric Cooperative agreed to provide electric service to MPC. In return, MPC promised to return Plains' investment through rates for steam and water services.[2] The Commission found that the agreements between Plains and MPC involved Plains' purchase of a "security" in MPC, as defined in Section 62–3–3(F), thus constituting a Class II transaction, as defined

2. Plains owns 4385–acre–feet per year of water rights and dedicates 3553–acre–feet per year to the PEGS operation. Plains conditioned MPC's use of Plains' water on the availability of sufficient water for the operation of PEGS.

in Section 62–3–3(K)(3), without prior approval in violation of Rule 450.7.

{5} Beginning in 1988, Plains provided non-utility, satellite-delivered television programming to rural electric consumers through SatCon, an unincorporated division of Plains. Following financial losses, Plains requested the Commission's approval to sell SatCon. In 1994, the Commission authorized Plains to sell SatCon. The Commission concluded that Plains' investment in and transactions with SatCon constituted Class II transactions, in violation of Rule 450.7, which required prior Commission approval.

{6} The Commission concluded that, in contravention of its CCN for the PEGS site, Plains committed six additional violations of the PUA. The Commission found that Plains used public utility property to provide MPC with non-utility services. The Commission identified the following violations: (1) the easements which Plains granted to MPC across the PEGS site; (2) Plains' agreement to provide steam service from PEGS to MPC; (3) Plains' agreement to sell water rights; (4) Plains' agreement to provide interim water service to MPC; (5) Plains' agreement to treat and dispose of wastewater produced by MPC; and (6) Plains' authorization which allowed MPC to perform site preparation work and access to that site across PEGS' property (site license).

**Standard of Review**

{7} Plains, as the party appealing from the Commission's Final Order, has the burden "to show that the order appealed from is unreasonable, or unlawful." NMSA 1978, § 62–11–4 (1965, repealed effective July 1, 2003). On appeal, this Court determines whether the Commission's "order is supported by substantial evidence, is neither arbitrary nor capricious, and is within the Commission's scope of authority." *El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 784, 787, 858 P.2d 1263, 1266 (1993); *accord Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984). We do not substitute our judgment for that of the Commission, and we view the evidence in the light most favorable to the Commission's Fi-

nal Order. *PNM Elec. Servs. v. New Mexico Pub. Util. Comm'n (In re Application of PNM Elec. Servs.),* 1998–NMSC–017, ¶ 11, 125 N.M. 302, 961 P.2d 147. "Substantial evidence requires that the appellate court review the whole record to determine whether there is substantial evidence to support the decision made by the Commission." *Attorney Gen.,* 101 N.M. at 553, 685 P.2d at 961. Although we defer to "Commission decisions requiring expertise in highly technical areas, such as utility rate determinations," we grant less deference "when reviewing determinations outside the realm of the Commission's expertise." *El Vadito,* 115 N.M. at 787, 858 P.2d at 1266.

**Did Plains' conveyance of vacant land for the MPC site constitute abandonment of a facility requiring prior Commission approval?**

{8} In 1993, Plains sold 41 acres of vacant land located within the 2564–acre PEGS site. The Commission found that this sale constituted an abandonment which requires Commission approval, relying on Section 62–9–5: "No utility shall abandon all or any portion of its facilities subject to the jurisdiction of the [C]ommission ... without first obtaining the permission and approval of the [C]ommission." The Commission determined that the definition of "facility" includes undeveloped, vacant land, that land owned by a utility within a rate base is a facility, and that the sale of property results in abandonment. We find the Commission's reasoning unpersuasive.

{9} The PUA establishes and authorizes the Commission to exercise regulatory jurisdiction over public utilities. *See* NMSA 1978, § 62–6–4(A) (1996, repealed effective July 1, 2003); *El Vadito,* 115 N.M. at 787, 858 P.2d at 1266. However, the Commission's "power over public utilities reaches no farther than what is statutorily authorized." *United Water N.M., Inc. v. New Mexico Pub. Util. Comm'n,* 1996–NMSC–007, 121 N.M. 272, 277, 910 P.2d 906, 911.

In construing a statute, our primary focus is to ascertain and give effect to the intent of the [L]egislature. Our interpretation of legislative intent comes primarily from the

language used by the [L]egislature, and we will consider the ordinary meaning of such language unless a different intent is clearly expressed.

*Roberts v. Southwest Community Health Servs.*, 114 N.M. 248, 251, 837 P.2d 442, 445 (1992) (citation omitted) (construing provisions of the Medical Malpractice Act).

■ {10} In order to determine whether Plains needed Commission approval to convey a portion of its property pursuant to Section 62–9–5, the initial question is whether the vacant 41 acres is part of the PEGS "facility." Both the title to Section 62–9–5, "Abandonment of service," and the content of the provision do not support the Commission's position that the undeveloped property constitutes part of the PEGS facility. Section 62–9–5 states:

> No utility shall abandon all or any portion of its facilities subject to the jurisdiction of the [C]ommission, or any service rendered by means of such facilities, without first obtaining the permission and approval of the [C]ommission. The [C]ommission shall grant such permission and approval, after notice and hearing, upon finding that the *continuation of service is unwarranted* or that the present and future public convenience and necessity do not otherwise require the *continuation of the service or use of the facility;* provided, however, that ordinary discontinuance of service or use of facilities for nonpayment of charges, nonuser or other reasons in the usual course of business shall not be considered as abandonment.

(Emphases added.) The Legislature's apparent purpose with regard to this provision is to grant authority to the Commission to oversee utilities contemplating abandonment of service and the potential effect upon consumers. The vacant land was unnecessary for Plains' utility operations, and Plains did not actually utilize the vacant land in its provision of utility services. Under these circumstances, the sale of vacant land for the purpose of generating revenue is not within the scope of this statute.

■ {11} " 'Unless a contrary intent is clear, courts will read and give effect to statutes as written, attributing to the words

their plain meaning.' " *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n,* 106 N.M. 622, 624, 747 P.2d 917, 919 (1987) (quoting *Waksman v. City of Albuquerque,* 102 N.M. 41, 43, 690 P.2d 1035, 1037 (1984)). The plain meaning of "facility" does not include vacant land but is, instead, "[s]omething that is built or installed to perform some particular function," or "something that promotes the ease of any action or course of conduct." *Black's Law Dictionary* 591 (6th ed.1990); *cf. Public Serv. Co.,* 106 N.M. at 624, 747 P.2d at 919 (relying on a dictionary definition for interpretation of the term "formation" for purposes of the PUA). Further, although the PUA does not define "facility," the definitional section of the PUA does contain the disjunctive phrase "plant, property or facility" in several subsections. *See, e.g.,* § 62–3–3(G)(1). Presumably, the Legislature purposefully chose to use the more restrictive term "facility" rather than a broader term, such as "property," for the abandonment-of-service statute. *See* § 62–9–5.

{12} Plains' 41 acre site is not a "facility," and there is no clearly expressed intent within the provision to include the conveyance of vacant land unrelated to utility services; accordingly, we need not reach the question of whether the sale of the land constituted abandonment for purposes of the statute. The conveyance of 41 acres of vacant property for the MPC site, which does not affect the utility services provided by Plains, is outside of the purpose of Section 62–9–5; thus, the ground upon which the Commission relied to require approval was improper.

**Did Plains' investment in building non-utility facilities for MPC in exchange for MPC's promise to reimburse Plains over time through charges for steam and water service constitute a Class II transaction under Section 62–3–3(K)(3) for which prior Commission approval was required?**

{13} "The [C]ommission shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations and in respect to its securities, ... and to do all things necessary and convenient in the

exercise of its power and jurisdiction." Section 62–6–4(A); *see PNM Elec. Servs.*, 1998–NMSC–017, ¶ 13. However, a counterbalancing purpose of the PUA is "to bring up to date the laws pertaining to public utilities and rural electric cooperatives so that the rural electric cooperative which is a public utility is subject to reasonable burdens and entitled to reasonable benefits which apply to public utilities generally." NMSA 1978, § 62–3–2(A)(4) (1985, repealed effective July 1, 2003); *see Public Serv. Co. v. New Mexico Pub. Serv. Comm'n (In re Application of Pub. Serv. Co.)*, 112 N.M. 379, 383, 815 P.2d 1169, 1173 (1991) ("The factors [for determining the appropriateness of abandonment] chosen by the Commission reflect the complex regulatory balance that must be struck between the interests of New Mexico energy consumers and those of the utility."). This Court, in order to bring about the purposes of the legislation, shall liberally construe the PUA. Section 62–3–2(B).

{14} "In order to assure reasonable and proper utility services at fair, just and reasonable rates," the Legislature authorized the Commission to investigate "Class II transactions or the resulting effect of such Class II transactions on the financial performance of the public utility to determine whether such transactions or such performance have an adverse and material effect on such service and rates." Section 62–6–19(B)(2). The Commission found that component transactions between Plains and MPC constituted Class II transactions, requiring prior Commission approval. In support of this finding, the Commission relies on Plains' investment of more than $8 million in MPC to build non-utility facilities in exchange for MPC's promise to reimburse Plains over time through charges for steam and water service. The Commission determined that Plains' agreements with MPC are subject to the PUA's definition of a "Class II transaction" because that definition includes "the agreement by a public utility to purchase securities or other ownership interest of a person ..., contribute additional equity to, acquire additional equity interest in or pay or guarantee any bonds, notes, debentures, deeds of trust or other evidence of indebtedness of any such person." Section 62–3–

3(K)(3). The Commission found that MPC is a "person" within the meaning of Section 62–3–3(K)(3) and noted that this statute's use of the word "securities" is defined as "stock, stock certificates, bonds, notes, debentures, mortgages or deeds of trust or other evidences of indebtedness issued, executed or assumed by any utility." Section 62–3–3(F). The Commission, in its Final Order, decided that MPC's promise to

> reimburse Plains for its investment in facilities owed by Plains and dedicated to serve MPC, and MPC's securing of that commitment through letters of credit are "evidences of indebtedness" by MPC. Plains purchased those evidences of indebtedness when it agreed to build and operate those facilities at its own expense in exchange for MPC's commitments.

{15} We reject the Commission's finding that the agreement between Plains and MPC for Plains to build facilities in exchange for MPC purchasing utility services over time is a "security" constituting a Class II transaction for purposes of Section 62–3–3(K)(3). While the Commission argues that the transaction falls under the "other evidences of indebtedness issued, executed or assumed by a utility" definition of "security" within Section 62–3–3(F), we hold that this exchange is not a security for purposes of the PUA. MPC's letters of credit are not evidence that *Plains* issued, executed, or assumed indebtedness; rather, it is evidence that MPC has assumed indebtedness.

{16} The Commission relies on *United States v. Austin*, 462 F.2d 724, 736 (10th Cir.1972) for its definition of the term: " '[E]vidence of indebtedness' is not limited to a promissory note or other simple acknowledgment of a debt owing and is held to include all contractual obligations to pay in the future for consideration presently received." However, we note significant disagreement with this definition, even by the Tenth Circuit itself. *See McGovern Plaza Joint Venture v. First of Denver Mortgage Investors*, 562 F.2d 645, 648 (10th Cir.1977) (distinguishing *Austin* and holding that the loan commitments were not securities within the federal securities laws).

In our view, the *Austin* court adopted a mode of analysis that elevated form over substance and failed to distinguish adequately between evidences of indebtedness issued and purchased in a commercial context and in an investment context. . . . [T]he [*Austin* ] court summarily concluded that regardless of the context in which the loan commitment was made, it was a security because it was a contractual obligation to pay in the future for consideration presently received. Read literally, the *Austin* court's holding would transform all loan agreements into securities.

*Cocklereece v. Moran,* 532 F.Supp. 519, 529 (N.D.Ga.1982) (footnote and citation omitted) (analyzing a violation of federal and state securities law); *accord LTV Fed. Credit Union v. UMIC Gov't Sec., Inc.,* 523 F.Supp. 819, 830 (N.D.Tex.1981) (rejecting *Austin,* because, as applied literally, "this standard makes every option contract a 'security,' for an option is but an agreement to sell or buy something (commodity, security or foreign currency) in the future, at a fixed price, for consideration presently received or paid"), *aff'd,* 704 F.2d 199 (5th Cir.1983). Even if we were to accept the Commission's reliance upon *Austin,* this definition of indebtedness does not support the Commission because Section 62–3–3(F) requires the *utility* to issue, execute, or assume the debt, and in the present case, MPC incurred the debt.

{17} The Commission argues that "MPC is contractually obligated to pay in the future for the present consideration of Plains building a backup boiler and other facilities for MPC's benefit and present use," and thus, "the agreement between Plains and MPC is a security and falls within the Class II definition." Amicus Public Service Company of New Mexico (PNM) observes that if the Commission's logic is extended, then, potentially, "the delivery of electric service to each of a public utility's customers, which results in the customer's obligation to pay for service already received, could constitute a Class II transaction." We agree with amicus that the Legislature did not intend such a sweeping definition of security. While we need not explore the precise dimensions of the term "security" as it is used in Section 62–3–3(F), we conclude that Plains' agreement with MPC is not of the same character as the expressed form of security outlined by the Legislature.

{18} The Commission also asserts that "[e]ven in the absence of a Class II transaction, the Commission also has the ability to prevent this type of situation under its general and exclusive power and jurisdiction to regulate the rates and service of public utilities under" NMSA 1978, § 62–6–4 (1996) and NMSA 1978, § 62–3–1(B) (1967, repealed effective July 1, 2003). Amicus Attorney General, relying upon *PNM Electric Services,* supports the Commission's assertion that it had authority over Plains in the absence of a Class II transaction violation. In *PNM Electric Services,* however, the Commission heard evidence regarding potential complications with the utility's requested services, including cross-subsidies, liability from lawsuits, antitrust immunity, utilization of utility employees and assets, and insufficient safeguards for the protection of ratepayers. *See* 1998–NMSC–017, ¶¶ 14–15, 125 N.M. 302, 961 P.2d 147. Here, other than the speculative assertion that "it is quite apparent that if an investment of this size were to go wrong, Plains' ability to provide reasonable and proper utility service at fair, just and reasonable rates could well, and probably would, be materially and adversely affected by its ensuing financial troubles," there were no findings equivalent to those in *PNM Electric Services.* Thus, there is not substantial evidence on the record to support the Commission's proposition. As a result, we need not address the scope of the Commission's authority over Plains concerning the regulation of rates and services pursuant to Section 62–6–4. *See PNM Elec. Servs .,* 1998–NMSC–017, ¶ 13, 125 N.M. 302, 961 P.2d 147 ("Because the Commission [as supported by substantial evidence in the record] acted pursuant to its power to ensure that utilities provide fair and just rates, the orders issued in this case were permissible.").

{19} Finally, the Commission asserts that the "unquestionable intent of the statute is to make any transaction which has the effect of financially assisting non-utility activity a Class II transaction" in order to

"protect the public interest," because "diversification in any form can harm ratepayers." In *Public Service Co.*, 139 Pub. Util. Rep. 4th (PUR) 245, 250 (N.M. Pub. Serv. Comm'n 1992), the Commission determined that utilities must receive prior approval for Class II transactions,[3] which the Commission broadly defined as any transaction which financially assists a non-utility activity. We hold that this definition is outside the Legislature's grant of authority to the Commission to investigate Class II transactions as defined in Section 62–3–3(K). The Legislature, in Section 62–3–3(K), specifically delineated the activities constituting Class II transactions in four subsections. The Commission's broad interpretation is beyond these specific definitions.

{20} The PUA states that "[t]he business of any public utility other than of the character defined in Subsection G of Section 62–3–3 NMSA 1978 is not subject to provisions of the Public Utility Act." NMSA 1978, § 62–3–4(B) (1992, prior to 1998 amendment). Section 62–3–3(G) defines "public utility" in part as every person "that now does or hereafter may own, operate, lease or control: (1) any plant, property or facility for the generation, transmission or distribution, sale or furnishing to or for the public of electricity for light, heat or power or other uses." Both Plains and amicus PNM argue that these provisions exempt non-utility activities from regulation by the Commission; they argue that the "character defined in Subsection G" refers to the "*business* of any public utility," and thus, non-utility business is excluded by the PUA. However, because we hold that the Commission relied on an improper interpretation of a security for a Class II transaction, it is unnecessary for us to address whether Section 62–3–3(G) provides the broad exemption that Plains and PNM advocate.

**Was Plains' investment in SatCon a Class II transaction requiring prior Commission approval?**

{21} The Commission found that Plains' investment in its SatCon division required

prior Commission approval as a Class II transaction because it was an "agreement by a public utility to purchase securities or other ownership interest of a person ..., contribute additional equity to, acquire additional equity interest in or pay or guarantee any bonds, notes, debentures, deeds of trust or other evidence of indebtedness of any such person." Section 62–3–3(K)(3). The Commission concluded that SatCon was a "person," as defined in Section 62–3–3(E) as "individuals, firms, partnerships, companies, rural electric cooperatives ..., corporations and lessees, trustees or receivers appointed by any court," and that the PUA did not specifically require SatCon to be a legally separate person. The Commission reasoned that "[t]he potential harm to ratepayers from utility diversification is the same whether it is carried out through a subsidiary or a division."

{22} Plains argues that SatCon is a division or unit of Plains and that Plains is expressly defined as a person because it is a corporation; thus, SatCon cannot be a separate or independent person as would be required in order to constitute a Class II transaction.

A separate, unincorporated, operating "division" of a corporation, as opposed to an incorporated subsidiary, is not entitled to separate legal treatment. It has been said that the term "division," unlike the term "subsidiary," has no precise meaning in the law, and by itself refers to no specific legal qualities entitling the organization, whether incorporated or not, to separate treatment.

1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 43, at 732 (perm. ed. rev.vol.1990) (footnotes omitted). While "[a] subsidiary and its parent corporation are viewed as independent corporations," *Cruttenden v. Mantura*, 97 N.M. 432, 434, 640 P.2d 932, 934 (1982), a division is not a separate entity for purposes of this statute. "[T]here can be little doubt that the operations of a corporate enterprise organized into divisions must be

---

**3.** *See Public Serv. Co.*, 106 N.M. at 625, 747 P.2d at 920 (upholding Commission's determination to require prior approval of a Class II transaction involving a holding company's restructuring).

judged as the conduct of a single actor." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (discussing the Sherman Act).[4] As a result, we conclude that the Commission erroneously determined that Plains' investment in SatCon constituted a Class II transaction.

**Did the Commission correctly determine that Plains violated its CCN when it provided or agreed to provide non-utility services to MPC?**

{23} "No public utility shall . . . begin the construction or operation of any public utility plant or system or of any extension of any plant or system, without first obtaining from the [C]ommission a certificate that public convenience and necessity require or will require such construction or operation." NMSA 1978, § 62–9–1 (1990, repealed effective July 1, 2003). The Commission issued an order granting Plains' CCN to construct and operate PEGS for utility purposes in 1980. Under NMSA 1978, § 62–9–6 (1967, repealed effective July 1, 2003), the Commission has the power to issue certificates "and may attach to the exercise of the rights granted by said certificates such terms and conditions in harmony with the [PUA] as in its judgment the public convenience and necessity may require." The Commission found that Plains' easements, its agreements to provide steam service and interim water service, sell water rights, treat and dispose of MPC's wastewater, and its site license violated the PUA as the use of public utility property to provide non-utility service inconsistent with Plains' CCN for the PEGS site.

■ {24} The Commission determined that Plains' CCN for PEGS did not specifically authorize Plains to provide non-utility service with utility property. The Commission asserts, relying upon *Public Service Co.*, that PEGS, as a certified public utility plant, became "affected with a public interest the

moment [Plains] sought certification[,][and][t]hat [this] public interest continues until the Commission deems it no longer in the public interest to continue its jurisdiction over the asset." 112 N.M. at 386 n. 5, 815 P.2d at 1176 n. 5. In *Public Service Co.*, the Commission determined the effect a utility's actions would have on the "future energy balance of New Mexico's energy consumers." *Id.* By contrast, in the present case, the Commission did not make findings relating the manner in which Plains' non-utility activities involving MPC and the PEGS site, such as easements and the provision of water, steam, and sewer service, affect the public-interest aspect of PEGS. Thus, the Commission's findings on this issue are not supported by substantial evidence. The Commission notes that it "is only required to make ultimate findings." *See* NMSA 1978, § 62–10–14 (1941, repealed effective July 1, 2003) ("The findings of fact shall consist only of such ultimate facts as are necessary to determine the controverted questions presented by the proceeding."); *Attorney Gen.*, 101 N.M. at 552, 685 P.2d at 960 (noting that statute only requires a finding of ultimate fact, defined as " 'the logical result of the proofs reached by reasoning from the evident facts' ") (citation omitted).

{25} Relying on *Lone Mountain Cattle Co. v. New Mexico Pub. Serv. Comm'n*, 83 N.M. 465, 469, 493 P.2d 950, 954 (1972), the Commission asserts that its "construction of the certificate issued by it and the statutes governing its operation was binding . . . unless this construction was unreasonable or unlawful." In *Lone Mountain*, the Commission's determination of the certificate involved the actual language of the certificate itself; specifically, the Commission interpreted the terms "surveys" and "construction." *See id.*, at 467–68, 493 P.2d at 952–53. Here, the Commission interpreted the lack of language within the CCN regarding non-utility

---

4. The Court, in *Copperweld*, also held that "[f]or similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Copperweld*, 467 U.S. at 771, 104 S.Ct. 2731. While the Court's holding regarding subsidiaries appears to be contrary to our holding in *Cruttenden*, we need not explore this conflict because the plain language of the PUA, Section 62–3–3(L) (separately defining a corporate subsidiary), and Section 62–3–3(K)(4) (deeming the divestiture of a subsidiary, though not the divestiture of a division, to be a Class II transaction), reflects the Legislature's intent to treat a subsidiary as a separate "person" with respect to Class II transactions.

service as the disallowance of any such activity.

 {26} Plains argues, and we agree, that the PEGS CCN does not specifically permit or restrict whether Plains may engage in non-utility services involving the PEGS site. While it may certainly be possible for the Commission to attach such restrictions upon a utility under Section 62-9-6 as the Commission "in its judgment [determines] the public convenience and necessity may require," the Commission did not do so when it approved the PEGS CCN. Therefore, in the absence of an express prohibition of these activities within a CCN, we hold that the effect of non-utility activities on the public interest is a necessary finding of ultimate fact for a conclusion that a public interest provision of a certificate has been violated. Because the Commission made no such finding and included no such express prohibition for Plains' activities, we conclude that the Commission erred.

### Conclusion

{27} "[T]he [Commission's] power over public utilities reaches no farther than what is statutorily authorized." *United Water*, 121 N.M. at 277, 910 P.2d at 911. Plains' conveyance of vacant property for the MPC site, because it does not affect Plains' provision of utility services to its customers, does not constitute the abandonment of a "facility" for purposes of the PUA; thus, the ground upon which the Commission relied to require prior approval was improper. We reject the Commission's finding that Plains' agreement with MPC committing Plains to build facilities in exchange for MPC's purchase of utility services over time is a "security," and thus, we conclude that it is not a Class II transaction. Because SatCon is a division of Plains, rather than a subsidiary, we also conclude that the Commission incorrectly found that Plains' investment in SatCon was a Class II transaction. Finally, because the PEGS CCN contained no specific restrictions regarding non-utility use, the Commission incorrectly determined that Plains violated the CCN when it provided or agreed to provide non-utility services to MPC. For the foregoing reasons, we annul and vacate the Order of the Commission.

{28} IT IS SO ORDERED.

FRANCHINI, C.J., BACA and MINZNER, JJ., concur.

HARRIS L HARTZ, C.J., New Mexico Court of Appeals (sitting by designation).

