# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2013-NMSC-042

Filing Date: August 29, 2013

Docket No. 33,393

NEW MEXICO ATTORNEY GENERAL
and NEW MEXICO INDUSTRIAL ENERGY
CONSUMERS,

      Appellants,

v.

NEW MEXICO PUBLIC REGULATION COMMISSION,

      Appellee,

and

PUBLIC SERVICE COMPANY OF NEW MEXICO,
COALITION FOR CLEAN AFFORDABLE ENERGY,
and WESTERN RESOURCE ADVOCATES,

      Real Parties in Interest.

APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION

Gary K. King, Attorney General
Jeffery S. Taylor, Assistant Attorney General
Santa Fe, NM

for Appellant New Mexico Attorney General

Peter Jude Gould
Santa Fe, NM

for Appellant New Mexico Industrial Energy Consumers

Margaret Kendall Caffey-Moquin
Santa Fe, NM

1

for Appellee

Benjamin Phillips
Albuquerque, NM

Cuddy & McCarthy, L.L.P.
Patrick T. Ortiz
Rebecca D. Dempsey
Santa Fe, NM

for Real Party in Interest Public Service Company of New Mexico

Charles F. Noble
Sante Fe, NM

for Real Party in Interest Coalition for Clean Affordable Energy

Steven S. Michel
Santa Fe, NM

for Real Party in Interest Western Resource Advocates

Hinkle, Hensley, Shanor & Martin, L.L.P.
Jeffrey L. Fornaciari
Dulcinea Z. Hanuschak
Santa Fe, NM

for Amicus Curiae Southwestern Public Service Company

**OPINION**

**DANIELS, Justice.**

**{1}** This case addresses whether in determining public utility electricity rates the New Mexico Public Regulation Commission (PRC) has authority to consider expenses incurred by a public utility for energy efficiency programs. Appellants, the New Mexico Attorney General and New Mexico Industrial Energy Consumers, ask us to vacate and annul the final order in PRC Case No. 11-00308-UT (Case 308 Final Order) because it permits Public Service Company of New Mexico (PNM) to earn returns on the operating expenses incurred from energy efficiency programs. Appellants argue that such returns are inconsistent with New Mexico law. We hold that the Case 308 Final Order is consistent with the PRC's ratemaking authority under the New Mexico Public Utility Act, NMSA 1978, §§ 62-3-1 to -5 (1967, as amended through 2009) (PUA), and the New Mexico Efficient Use of Energy Act, NMSA 1978, §§ 62-17-1 to -11 (2005, as amended through 2013) (EUEA), and with

our holding in *Attorney General v. New Mexico Public Regulation Commission* (*AG v. PRC 2011*), 2011-NMSC-034, 150 N.M. 174, 258 P.3d 453. We also hold that the Case 308 Final Order is supported by substantial evidence and is neither arbitrary nor capricious. Accordingly, we affirm the Case 308 Final Order.

## I.     BACKGROUND

### A.     Statutory and Regulatory Background

**{2}**    Enacted in 2005, the EUEA calls for the PRC to identify and eliminate regulatory disincentives or barriers for public utility expenditures on energy efficiency and load management measures "in a manner that balances the public interest, consumers' interests and investors' interests." *See* §§ 62-17-2(E), -3, & -5(F); *see also* § 62-17-4(F) & (H) (defining "energy efficiency" to include "energy conservation measures, or programs that target consumer behavior, equipment or devices to result in a decrease in consumption of electricity and natural gas without reducing the amount or quality of energy services" and describing "load management" as "measures or programs that target equipment or devices to result in decreased peak electricity demand . . .""). To implement the EUEA, the PRC promulgated its energy efficiency regulations, 17.7.2 NMAC (03/01/2007, replaced 05/03/2010). In relevant part, the regulations require utilities to file proposals with the PRC to remove disincentives or barriers to energy efficiency programs that utilities believe exist. *See* 17.7.2.9(K) NMAC (03/01/2007).

**{3}**    The Legislature amended the EUEA in 2008 to specifically require the PRC to give utilities an opportunity to earn a profit on cost-effective energy efficiency and load management resource development. *See* § 62-17-5(F) (2008). After the 2008 amendments to the EUEA, the PRC issued an order to conduct a rulemaking proceeding to revise 17.7.2 NMAC through a series of workshops with interested parties. *See AG v. PRC 2011*, 2011-NMSC-034, ¶ 4. The workshops produced a proposed amendment to the regulations known as Alternative A. *See id.* ¶ 5.

**{4}**    Alternative A would (1) temporarily allow utilities to recover an Interim Adder at rates of $0.01 for each kilowatt hour saved and $10.00 for each kilowatt reduced from the annual demand due to approved energy efficiency programs, (2) require utilities and interested parties to file proposals for a permanent solution to eliminate disincentives to energy efficiency programs, and (3) after the temporary Interim Adder expired, allow utilities to continue receiving a Reduced Adder at rates of $0.005 for every kilowatt hour saved and $10.00 for each kilowatt reduced from the annual demand due to approved energy efficiency programs. *See id.*

**{5}**    On April 8, 2010, the PRC adopted the proposed Alternative A in a final order. *See* N.M. Pub. Regulation Comm'n, *Final Order Repealing and Replacing 17.7.2 NMAC*, Case No. 08-00024-UT (April 8, 2010) (Case 024 Final Order), *available at* http://www.nmprc.state.nm.us/ (follow hyperlinks: "Case Lookup Edocket" under QUICK

LINKS and then "Documents Search" under Search). The revised energy efficiency regulations became effective on May 3, 2010. *See* 17.7.2.5 NMAC (05/03/2010).

## B.      Factual and Procedural Background

**{6}**      On June 23, 2011, the PRC issued a final order further reducing the Reduced Adder rates by sixty percent to accomplish the requirements of the EUEA and 17.7.2 NMAC with respect to PNM. *See* N.M. Pub. Regulation Comm'n, *Final Order Partially Adopting Recommended Decision*, Case No. 10-00280-UT (June 23, 2011) (Case 280 Final Order), *available at* http://www.nmprc.state.nm.us/ (follow hyperlinks: "Case Lookup Edocket" under QUICK LINKS and then "Documents Search" under Search). On July 27, 2011, we issued *AG v. PRC 2011*, vacating the PRC's Case 024 Final Order adopting the revisions to 17.7.2 NMAC because in its rulemaking the PRC had not "adequately balance[d] the investors' interests against the ratepayers' interests when adopting Alternative A." *AG v. PRC 2011*, 2011-NMSC-034, ¶¶ 1, 18-19.

**{7}**      Subsequently, on August 16, 2011, the PRC docketed a case to investigate whether PNM's adder rates approved in Case 280 were consistent with our ruling in *AG v. PRC 2011*. The PRC issued the Case 308 Final Order on November 3, 2011, N.M. Pub. Regulation Comm'n, *Final Order*, Case No. 11-00308-UT (November 3, 2011), *available at* http://www.nmprc.state.nm.us/ (follow hyperlinks: "Case Lookup Edocket" under QUICK LINKS and then "Documents Search" under Search), wherein it found that PNM's approved adder rates were not based on the PRC's vacated Case 024 Final Order replacing 17.7.2 NMAC and were consistent with our holding in *AG v. PRC 2011*. *See Final Order*, Case 308, ¶¶ 30, 36. On January 19, 2012, Appellants filed a notice of direct appeal of the Case 308 Final Order to this Court. *See* NMSA 1978, § 62-11-1 (1993) ("Any party to any proceeding before the [PRC] may file a notice of appeal in the supreme court asking for a review of the [PRC's] final orders.").

## II.      DISCUSSION

**{8}**      Appellants argue that the Case 308 Final Order is inconsistent with New Mexico law because it is contrary to our opinion in *AG v. PRC 2011*. Appellants read our holding in that case as a mandate to the PRC to use *only* traditional ratemaking principles, specifically the so-called return-on-rate-base method—which establishes a utility's revenue requirements by determining operation costs, net value of the utility's capital investment ("rate base"), and

the rate of return—for setting utility rates.[1] *See* 2011-NMSC-034, ¶ 17. Because Appellants interpret *AG v. PRC 2011* as a specific mandate limiting the methods the PRC may use for determining just and reasonable utility rates, they necessarily conclude that the PRC acted outside the scope of its authority in approving adder rates that were not determined using a traditional return-on-rate-base method. Further, Appellants argue that the Case 308 Final Order is unsupported by substantial evidence because, rather than conducting additional fact-finding hearings, the PRC relied on the factual determinations in the record from Case 280 to support its legal determination in Case 308. Finally, Appellants argue that the rationale articulated by the PRC to justify its Case 308 Final Order is inappropriate and unreasonable and therefore arbitrary and capricious. For the reasons stated in this opinion, we disagree.

## A. Standards of Review

**{9}** We review an administrative order "to determine if it is arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or, otherwise not in accordance with law." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806; *accord* Rule 1-075(R) NMRA. "The burden is on the parties challenging the agency order to make this showing." *AG v. PRC 2011*, 2011-NMSC-034, ¶ 9; *accord* NMSA 1978, § 62-11-4 (1965). We "have no power to modify the action or order appealed from, but [must] either affirm or annul and vacate the same." NMSA 1978, § 62-11-5 (1982).

**{10}** "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of Sierra Club*, 2003-NMSC-005, ¶ 17. "In making these determinations, we must remain mindful that in resolving ambiguities in the statute or regulations which an agency is charged with administering, the Court generally will defer to the agency's interpretation if it implicates agency expertise." *Id.* (internal quotation marks and citation omitted). "However, we will not defer to the [agency's] or the district court's statutory interpretation, as this is

---

[1]Appellants' briefing argues that in *AG v. PRC 2011* this Court "set[] forth the traditional elements of the rate setting process that the Commission was required to follow." Counsel for the Attorney General asserted at the December 10, 2012, oral argument that "this specific methodology of providing a profit [to PNM] has to be done according to traditional ratemaking principles" and explained that the traditional ratemaking concept requiring "that returns . . . be related to investment goes back to the beginnings of utility regulation. Rate of return on rate base was suggested or implied by constitutional caselaw. The central pillar in the administration of just and reasonable rate standard will be found in the allowance of regulated companies' costs of operation plus a reasonable rate of return on rate base." Also at oral argument, counsel for New Mexico Industrial Energy Consumers took the same stance: "So we think basically that the [PRC] simply chose the wrong methodology in this case."

a matter of law that we review de novo." *Id.*

**B.      The Case 308 Final Order Is Reasonable and Lawful**

**{11}**      In reviewing the Case 308 Final Order "we begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *AG v. PRC 2011*, 2011-NMSC-034, ¶ 9 (internal quotation marks and citation omitted). The case before us involves a question of law—whether the public utility electricity rates established by the PRC in Case 280 satisfy the legal requirements we outlined in *AG v. PRC 2011*. Utility ratemaking is undoubtedly a matter within the PRC's specialized field of expertise. *See* NMSA 1978, § 62-6-4(A) (2003) ("The [PRC] shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations . . . in accordance with the provisions and subject to the reservations of the [PUA], and to do all things necessary and convenient in the exercise of its power and jurisdiction."); *Plains Elec. Generation & Transmission Coop., Inc. v. N.M. Pub. Util. Comm'n*, 1998-NMSC-038, ¶ 7, 126 N.M. 152, 967 P.2d 827 ("[W]e defer to [PRC] decisions requiring expertise in highly technical areas, such as utility rate determinations." (internal quotation marks and citation omitted)).

**{12}**      " 'When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation.' " *Rodriguez v. Permian Drilling Corp.*, 2011-NMSC-032, ¶ 8, 150 N.M. 164, 258 P.3d 443 (quoting *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28). "[T]he court will confer a heightened degree of deference to the agency on legal questions that determine fundamental policies within the scope of the agency's statutory function." *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 6, 146 N.M. 24, 206 P.3d 135. However, the court "'is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law.'" *Rodriguez*, 2011-NMSC-032, ¶ 8 (quoting *Morningstar*, 1995-NMSC-062, ¶ 11). "The court should reverse if the agency's interpretation of a law is unreasonable or unlawful." *Morningstar*, 1995-NMSC-062, ¶ 11.

**1.      The PRC's Interpretation of the EUEA and the PUA Is Consistent with Our Holding in *AG v. PRC 2011***

**{13}**      Appellants argue that in *AG v. PRC 2011* this Court "rejected the notion that utilities should be allowed to earn a profit on program expenses without making any capital investment," mandated that the PRC use only the traditional return-on-rate-base method for setting just and reasonable utility rates, and established a single regulatory paradigm for determining utility rates under both the EUEA and the PUA. Based on their interpretation of *AG v. PRC 2011*, they argue that in the Case 308 Final Order the PRC failed to properly balance the relevant investor and ratepayer interests, failed to apply the traditional elements

6

of utility ratemaking in establishing PNM's Reduced Adder rates, and failed to follow this Court's interpretation of the controlling ratemaking principles. Appellants misread our previous holding.

**{14}** *AG v. PRC 2011* involved a challenge to the PRC's rulemaking pursuant to the 2008 amendments to the EUEA requiring the PRC to identify and remove barriers to public utility expenditures on resource development for energy efficiency and load management. *See* 2011-NMSC-034, ¶¶ 2-4, 8. The PRC set an adder rate applicable uniformly to the public utilities and designed to remove such barriers and incentivize such expenditures. *See id.* ¶¶ 4-5, 7-8. On appeal, we held that "[t]he PRC's adoption of the [uniform] adder rates was arbitrary and unlawful in that they were not evidence-based, cost-based, []or utility specific." *Id.* ¶ 18. Although the PRC heard evidence from the utility companies about the expected impact of the uniform adder rates, it did not conduct an adequate inquiry to "balance the investors' interests against the ratepayers' interests." *Id.* We observed that the PUA requires such balancing to assure that the rate the PRC sets is "'just and reasonable.'" *Id.* ¶ 13 (quoting NMSA 1978, § 62-8-1 (1941)). We noted that the Legislature intended the same balancing method to assure that the rate created under the EUEA is "'just and reasonable.'" *AG v. PRC 2011*, 2011-NMSC-034, ¶ 14 (citing §§ 62-17-2(E) & -3). "Both [the PUA and the EUEA] require the PRC to balance the public interest, consumers' interests, and investors' interests." *AG v. PRC 2011*, 2011-NMSC-034, ¶ 15. Because the PRC failed to apply this balancing test, we held that the PRC had no basis for determining that the uniform adder rates were "'just and reasonable.'" *Id.* ¶ 18.

**{15}** With respect to the required balancing test, we stated that "[w]hen determining the investor's interest, the PRC takes into account the utility's interest in recovering its prudently incurred costs and earning a reasonable return on its capital investments." *Id.* ¶ 16. "The ratepayer's interest, on the other hand, is to be protected from excessive rates that unjustly burden ratepayers while receiving steady and quality service from the utility." *Id.* We recognized that "[t]here is a significant zone of reasonableness . . . between utility confiscation and ratepayer extortion," *id.* (omission in original) (internal quotation marks and citation omitted), and that "[t]he PRC is vested with considerable discretion in determining whether a rate to be received and charged falls within [that] zone," *id.* ¶ 17 (internal quotation marks and citation omitted). "The factors the PRC uses to determine whether a proposed rate falls within the zone of reasonableness are based on [the utility's] revenue requirements: the costs of supplying the fuel and profit for the utility in an amount sufficient to encourage investment." *Id.* ¶ 17 (alteration in original) (internal quotation marks and citation omitted).

**{16}** *AG v. PRC 2011* requires the PRC to set utility rates that are evidence based, cost based, and utility specific. *See id.* ¶ 18. It also clarifies that under the PUA and the EUEA the PRC must balance investors' interests against ratepayers' interests when determining whether a utility rate is just and reasonable. *Id.* However, it does *not* prescribe the use of any particular ratemaking method—or restrict the use of others—as Appellants argue. The Case 308 Final Order is consistent with this reading of *AG v. PRC 2011*.

7

**{17}** In the Case 308 Final Order, the PRC found that PNM's Reduced Adder rates approved in Case 280 were cost based, evidence based, and utility specific. *See Final Order*, Case 308, ¶¶ 29-30, 36. In Case 280 the PRC gave due consideration to PNM's revenue requirements in balancing the ratepayers' interests with the investors' interests. The PRC determined PNM's revenue requirements by using an "operating ratio approach" it deemed appropriate for "situation[s] in which investor-provided capital and the related capital costs have not been a significant factor in the total cost of providing services." *Id.* ¶ 25 (internal quotation marks and citation omitted). The operating ratio approach establishes a regulated entity's revenue requirements "by dividing operating expenses by a target operating ratio deemed necessary to produce revenues adequate to cover operating expenses plus depreciation, taxes and capital *costs*." *Id.* (emphasis added) (internal quotation marks and citation omitted). Unlike the return-on-rate-base method, the operating ratio approach does not use the net value of capital investment in determining the regulated company's revenue requirement. Based on the evidence regarding program costs and PNM's revenue requirements, the PRC rejected PNM's proposed Reduced Adder rates of $0.005 per kilowatt hour of lifetime energy savings and $10 per kilowatt of demand savings, and instead—balancing the public interest, consumers' interests, and investors' interests—approved a lesser rate of $0.002 per kilowatt hour of lifetime energy savings and $4 per kilowatt of demand savings. *See Final Order*, Case 280, ¶ 51; *see also Final Order*, Case 308, ¶ 29 (noting that the information in the Case 308 Final Order concerning PNM's Reduced Adder rates is the same as in the Case 280 Final Order except for a typographical error in the lifetime energy savings rate in the Case 308 Final Order).

**{18}** The PRC's interpretation of the ratemaking requirements in the EUEA and the PUA is consistent with our holding in *AG v. PRC 2011* because the PRC determined that the rates approved in Case 280 were cost based, evidence based, and utility specific, and because the PRC balanced the investors' interests with the ratepayers' interests in determining just and reasonable rates—instead of simply adopting the rates proposed by PNM. *See Final Order*, Case 280, ¶ 51; *see also Final Order*, Case 308, ¶ 29.

### 2. The EUEA Gives the PRC Authority to Eliminate Financial Disincentives to Energy Efficiency and Load Management Measures

**{19}** Appellants also argue that the PRC acted outside the scope of its authority in permitting PNM to earn a profit on energy efficiency program expenses without making any capital investment. Appellants overlook the authority the EUEA gives the PRC to identify and remove regulatory disincentives or barriers to public utility expenditures on energy efficiency and load management measures, including specifically the authority to allow utilities to earn a profit on energy efficiency and load management resource development.

**{20}** The PUA, which sets forth the requirements for determining utility rates in New Mexico, requires rates set by the PRC to be just and reasonable. *See* § 62-8-1. A just and reasonable rate is one that balances the public interest, the interests of consumers, and the interests of investors in public utility companies. *See, e.g.*, *AG v. PRC 2011*, 2011-NMSC-

034, ¶ 13 ("Under the PUA, a rate is 'just and reasonable' when it balances the investor's interest against the ratepayer's interest."); *PNM Gas Servs. v. N.M. Pub. Util. Comm'n*, 2000-NMSC-012, ¶ 8, 129 N.M. 1, 1 P.3d 383 ("Ultimately, the [PRC] must ensure that rates are neither unreasonably high so as to unjustly burden ratepayers with excessive rates nor unreasonably low so as to constitute a taking of property without just compensation or a violation of due process by preventing the utility from earning a reasonable rate of return on its investment.").

**{21}** In 2005—nearly forty years after the PUA was enacted—our Legislature enacted the EUEA, which recognizes energy conservation as an important principle of New Mexico public policy. *See* § 62-17-3 (2005). The EUEA acknowledges that there are regulatory disincentives that prevent public utilities from including cost-effective energy efficiency and load management programs in their energy resource portfolios. *See id.* For example, the traditional ratemaking formulas provide incentives for utilities to invest in supply-side resources such as generating plants or transmission lines because that is how utilities traditionally make money: the larger the rate base—or capital investment—the greater the energy supply and the larger the profit. The more energy utilities sell, the more money they make. On the other hand, when a utility implements the statutory energy efficiency program to *reduce* the amount of energy consumed by its customers, "[t]his necessarily results in a reduction in the utility's revenue." *AG v. PRC 2011*, 2011-NMSC-034, ¶ 11. The EUEA calls for the removal of such regulatory disincentives "in a manner that balances the public interest, consumers' interests and investors' interests." Sections 62-17-2(E), -3, & -5(F).

**{22}** In 2008, our Legislature amended the EUEA specifically to allow utilities to earn a profit on energy efficiency development and provide incentives for implementing energy efficiency programs. *See* § 62-17-5(F) (2008) (requiring the PRC to provide "utilities an opportunity to earn a profit on cost-effective energy efficiency and load management resource development that . . . is financially more attractive to the utility than supply-side utility resources"); § 62-17-6(A) (2008) (allowing public utilities to recover their prudent and reasonable costs along with PRC-approved incentives for implementing demand-side resources and load management programs through either a tariff rider or in base rates or through a combination of both). Through the EUEA, the Legislature has given the PRC authority to allow utilities to earn a profit on energy efficiency expenditures. Nothing in the language of the EUEA requires the profit incentive to be tied to capital investments.

**{23}** The parties disagree as to what is meant by the word profit in the EUEA. Appellants urge this Court to interpret "profit" as a term of art in the regulatory context that equates to a utility's rate of return on its invested, at-risk capital. Thus, in Appellants' view, a profit approved by the PRC must be tied to a utility's invested, at-risk capital. If "profit" is necessarily tied to a utility's capital investment, then a determination of the utility's revenue requirement (for purposes of balancing the ratepayers' interests against the investors' interests) obliges the PRC to adhere to traditional ratemaking principles for setting just and reasonable utility rates under the PUA and the EUEA. Appellants argue that PNM's Reduced Adder rates for energy efficiency programs upsets the PUA and the EUEA balancing

9

interests by requiring ratepayers to compensate PNM shareholders for risk they have not taken.

**{24}** PNM urges us to apply the broader ordinary meaning of "profit." Interpreting "profit" as any earning above (expense *or* capital) costs, PNM argues that the balancing requirement in the PUA can be harmonized with the same requirement in the EUEA in a way that does not require the use of a return-on-rate-base method to achieve just and reasonable utility rates.

**{25}** While the PUA and the EUEA both require the PRC to establish just and reasonable rates by balancing investors' interests against ratepayers' interests, there is no indication that "profit" in the EUEA was intended to mean a utility's return on its invested capital, and thus there is no need to require the PRC to accomplish the balancing test by applying a return-on-rate-base method for setting public utility rates. We apply our principles of statutory construction to interpret the meaning of "profit" in the EUEA to discern whether the Legislature intended to impose such a requirement.

**{26}** Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance. *See State v. Nick R.*, 2009-NMSC-050, ¶ 18, 147 N.M. 182, 218 P.3d 868 (recognizing that our courts interpret the intended meaning of statutory language by consulting the dictionary to ascertain the words' ordinary meaning). The plain meaning rule requires that statutes "be given effect as written without room for construction unless the language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious spirit or reason." *State v. Maestas*, 2007-NMSC-001, ¶ 9, 140 N.M. 836, 149 P.3d 933 (internal quotation marks and citation omitted).

**{27}** A "ratio . . . to the amount of capital invested" is just one of multiple definitions for the word profit and is the only definition that specifically refers to the invested "capital." *See, e.g.*, *Webster's Third New Int'l Dictionary of the English Language Unabridged* 1811 (1976). Other definitions include "an advantage, benefit, accession of good, gain, or valuable return . . . [;] the excess of returns over expenditure in a transaction or series of transactions . . . [; and] a benefit or advantage accruing . . . from the conduct of business." *Id.* Notably, there is no indication that our Legislature intended to impose a different meaning to the word profit other than its ordinary meaning. *See* § 62-3-3 (containing no definition for the word profit in the PUA); § 62-17-4 (same in the EUEA). We interpret "profit" in the EUEA according to its ordinary meaning as any return over expenditure. Applying the plain meaning of the word in this case incurs no injustice, absurdity, or contradiction. Meanwhile, the narrower definition of "profit" Appellants promote would have the effect of requiring the PRC to use a return-on-rate-base method for setting public utility electricity rates. This requirement would render much (if not all) of the EUEA meaningless. We do not interpret our statutes so as to deprive them of their intended meaning. *See Benavidez v. Sierra Blanca Motors*, 1996-NMSC-045, ¶ 18, 122 N.M. 209, 922 P.2d 1205 ("We presume that the

10

Legislature is well informed regarding existing statutory and common law and does not intend to enact a nullity."). Therefore, we reject Appellants' proposed definition of "profit" and conclude that the EUEA gives the PRC authority to allow utilities to earn a return on expenditures incurred on energy efficiency and load management resource development.

## C.    Substantial Evidence Supports the Case 308 Final Order

**{28}**    We address Appellants' argument that the Case 308 Final Order is not supported by substantial evidence in the record. Appellants point out that the PRC had to look to the Case 280 record to determine that (1) energy efficiency and load management programs do not involve much, if any, utility capital investment, and (2) PNM's Reduced Adder rates were evidence based, cost based, and utility specific. Appellants argue that the substantial evidence requirement is specific to each case and that the PRC cannot satisfy the requirement by relying on evidence presented in other proceedings. Appellants ignore the purpose of Case 308 and the interrelatedness of this case to Case 280.

**{29}**    "[F]or purposes of reviewing administrative decisions the substantial evidence rule is expressly modified to include whole record review." *Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n* (*NCCI*), 1988-NMSC-036, ¶ 7, 107 N.M. 278, 756 P.2d 558. "When applying whole record review, the reviewing court views the evidence in the light most favorable to the agency decision, but may not view favorable evidence with total disregard to contravening evidence." *Herman v. Miners' Hosp.*, 1991-NMSC-021, ¶ 6, 111 N.M. 550, 807 P.2d 734 (internal quotation marks and citation omitted). "To conclude that an administrative decision is supported by substantial evidence in the whole record, the court must be satisfied that the evidence demonstrates the reasonableness of the decision," and that "[n]o part of the evidence may be exclusively relied upon if it would be unreasonable to do so." *NCCI*, 1988-NMSC-036, ¶ 8.

**{30}**    In *TW Telecom of New Mexico, L.L.C. v. New Mexico Public Regulation Commission*, we reversed a final order from the PRC regarding telephone rates because the PRC violated the appellant's constitutional due process rights by relying on evidence in a separate case without providing the appellant the opportunity to present evidence and cross-examine witnesses on the impact of the evidence from the separate case on the issues involved in the case on appeal. *See* 2011-NMSC-029, ¶¶ 7, 20-21, 150 N.M. 12, 256 P.3d 24. Appellants rely on *TW Telecom* in arguing that because the PRC relied on its factual findings from Case 280 to support its legal determinations in Case 308, the Case 308 Final Order is unsupported by substantial evidence in the record for Case 308. Unlike *TW Telecom*, this case does not involve a utility ratemaking decision; rather, this case involves the question of whether the utility rates established in Case 280 meet the legal requirements we described in *AG v. PRC 2011*. Accordingly, the PRC's decision in Case 308 was not dependent on the resolution of any unsettled factual issues—as it would be in a utility ratemaking case like *TW Telecom*. Instead, Case 308 concerned only the resolution of a specific legal issue that did not depend on a redetermination of the facts already adjudicated in Case 280.

**{31}**     In determining the legal sufficiency of its Case 280 Final Order, the PRC was not only justified in looking to the record for Case 280 but was required to do so. *See Mountain States Tel. & Tel. Co. v. State Corp. Comm'n*, 1959-NMSC-035, ¶ 9, 65 N.M. 365, 337 P.2d 943 (holding that "the burden is on the [PRC] to produce evidence warranting its action"). Because the underlying factual matters had already been adjudicated in Case 280, the PRC did not need to reestablish those facts in Case 308. The Case 280 Final Order was never appealed, and the factual basis for that order cannot be challenged now. *See Cmty. Pub. Serv. Co. v. N.M. Pub. Serv. Comm'n*, 1983-NMSC-026, ¶ 9, 99 N.M. 493, 660 P.2d 583 (holding that an attack on a rule or regulation is time-barred if it is not brought within the thirty-day period set out in Section 62-11-1). Therefore, because the factual matters the PRC relied upon in deciding Case 280 have already been adjudicated, and because Case 308 involves a legal review of the Case 280 Final Order, it was not unreasonable for the PRC to rely on the record in Case 280 for factual evidence to support the Case 308 Final Order.

**D.      The Case 308 Final Order Is Neither Arbitrary nor Capricious**

**{32}**     Finally, Appellants challenge the reasonableness of the PRC's reliance on the New Mexico Motor Carrier Act, NMSA 1978, §§ 65-2A-1 to -41 (2003, as amended through 2013), and the operating ratio method in the Case 308 Final Order authorizing PNM to earn a profit on expenses incurred for energy efficiency programs. The record shows that the PRC offered an explanation for the method it applied to determine PNM's Reduced Adder rates. Appellants challenge this method as "inappropriate" because the PRC analogized it to the ratemaking method it uses for determining rates under the Motor Carrier Act. Appellants argue that the Legislature did not intend the Motor Carrier Act to apply to the regulation of New Mexico's electricity utilities.

**{33}**     Appellants overlook two key points. First, the PRC did not actually apply the Motor Carrier Act to its ratemaking decision in Case 280. The PRC merely mentioned the Motor Carrier Act *to exemplify* circumstances—when investor capital is not significant to the cost of providing service—that call for an alternative to the return-on-rate-base method (such as the operating ratio method) for determining just and reasonable rates. Second, the PRC "is vested with considerable discretion in determining whether a rate to be received and charged is just and reasonable." *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 1980-NMSC-005, ¶ 4, 94 N.M. 731, 616 P.2d 1116. The PRC's discretion extends to determining the appropriate method for establishing just and reasonable rates. *See PNM Gas Servs.*, 2000-NMSC-012, ¶ 7 ("Because of the level of complexity involved in setting rates and the number of variables at issue in every rate proceeding, the [PRC] is not bound to the use of any single formula or combination of formulae in determining rates. The ratemaking function involves the making of pragmatic adjustments. It is the result reached, not the method employed, which is controlling." (internal quotation marks and citation omitted)).

**{34}**     While the PRC has considerable discretion to determine just and reasonable rates for public utilities, "the [PRC] is not free to disregard its own rules and prior ratemaking decisions or to change its position without good cause and prior notice to the affected

parties." *Id.* ¶ 9 (internal quotation marks and citation omitted). In this case, the legislative mandates in the EUEA were good cause for the PRC to change its position with respect to the appropriate method to employ for determining public utility electricity rates based on expenditures for energy efficiency measures. The PRC did not disregard its own regulations and prior ratemaking decisions; it simply used a substitute method it has traditionally used in other situations where investor capital is not a significant factor in the total cost of providing service. The PRC's reliance on the Motor Carrier Act to explain its method by analogy was not unreasonable or inappropriate. The Case 308 Final Order is neither arbitrary nor capricious.

## III.  CONCLUSION

**{35}**  The PRC's Case 308 Final Order is consistent with our holding in *AG v. PRC 2011* and with the authority specifically granted to the PRC by the EUEA. Case 308 involved only the determination of legal sufficiency of the Case 280 Final Order. The underlying facts in Case 280 were already adjudicated, and no timely appeal was filed in that case, so there was no need for the PRC to decide additional questions of fact. The PRC has discretion to determine the appropriate method to apply in establishing just and reasonable utility rates, and it lawfully exercised its discretion here. Accordingly, we affirm the Case 308 Final Order.

**{36}  IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**

**Topic Index for *N.M. Atty. Gen. v. N.M. Pub. Regulation Comm'n*, No. 33,393**

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Law, General

Arbitrary and Capricious Actions
Legislative Intent
Standard of Review
Sufficiency of Evidence

**APPEAL AND ERROR**
Standard of Review

**PUBLIC UTILITIES AND COMMUNICATIONS**
Electric
Public Utilities, General
Rate Making