IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2014-NMCA-098

Filing Date: July 11, 2014

Docket No. 32,499

SOUTHWEST RESEARCH AND
INFORMATION CENTER and
MARGARET ELIZABETH RICHARDS,

      Plaintiffs-Appellants,

v.

NEW MEXICO ENVIRONMENT
DEPARTMENT,

      Defendant-Appellee.

IN THE MATTER OF THE APPLICATION
FOR A CLASS 2 MODIFICATION FOR
SHIELDED CONTAINERS FOR REMOTE-
HANDLED TRANSURANIC WASTE AT THE
WASTE ISOLATION PILOT PLANT.

APPEAL FROM THE NEW MEXICO ENVIRONMENT DEPARTMENT
Dave Martin, Secretary

Lindsay A. Lovejoy, Jr.
Santa Fe, NM

for Appellants

New Mexico Environment Department
Charles de Saillan, Special Assistant Attorney General
Santa Fe, NM

for Appellee

Kenneth J. Gonzales, United States Attorney, District of New Mexico
Michael H. Hoses, Assistant United States Attorney
Albuquerque, NM

1

United States Department of Energy
Environment and Natural Resources Division
Robert G. Dreher, Acting Assistant Attorney General
Eileen T. McDonough, Environmental Defense Section
Washington, D.C.

for Intervenor United States Department of Energy

## OPINION

**SUTIN, Judge.**

## INTRODUCTORY COMMENTS

**{1}** This case was submitted to a panel of this Court in December 2013. As will be discussed in detail in this Opinion that follows this preface, the appeal raised legal, procedural questions related to the New Mexico Environment Department's (NMED) approval of a permit modification request to allow the WIPP site to accept waste in a newly developed shielded container. As this Court was working toward issuance of an opinion in this matter, news of the February 2014 fire and radiation leak at the WIPP site led the Court to determine that prudence warranted postponing the issuance of an opinion until more was known about the February 2014 incidents. In April 2014, we set a hearing for June 26, 2014, and ordered the parties to apprise the Court of the impact of the recent developments, if any, on the issues before the Court in this appeal. The hearing notice stated, in part:

> The Court in particular requests the views of the parties as to whether it should continue its analyses and deliberations at this time in light of the uncertainty about what may or may not be required or changed in the future in regard to operations and safety equipment that may have some impact on the issues before the Court.

Attorneys representing NMED, the federal Department of Energy (DOE), and Southwest Research and Information Center (Southwest Research) presented their respective views in the June 26, 2014, hearing.

**{2}** All parties agreed in the hearing that the WIPP site was closed and that it was not possible to estimate, with any degree of certainty, when the site would open. Southwest Research indicated that the site may never again be reopened given the extent of the contamination of the site. Based on the facts known to date, the extensive amount of investigation and analysis devoted to resolving the issues and the amount of money being allocated by Congress for recovery and opening, NMED was confident that the site would open at some point. DOE also expressed confidence that the site would open, but likely not before 2015 or 2016.

**{3}**     Southwest Research's position at the hearing was that it was premature to make a decision on the propriety of the shielded container-related modification given the many uncertainties, including, without limitation, what caused the radiation leak, whether a decision must be made to close WIPP permanently, whether, if WIPP is opened at some point, the opening will be subject to material changes in drums or shielded containers, in procedures for storage, and in infrastructure requiring a redesign of the WIPP site and its functions.  Southwest Research requested that this Court remand the matter to NMED with instructions to revisit the approval of the shielded container-related permit modification request.  In Southwest Research's view, remand would allow NMED to consider  the propriety of the permit modification in the context of any changes to WIPP that will likely be required as a result of the February 2014 incidents before the facility may open.

**{4}**     NMED and DOE shared a view that it was not likely that anything that arose from the ongoing investigations and analyses of the February 2014 incidents would impact the issues in the case before this Court.  NMED and DOE indicated that there was no reason to believe that changes relating to waste storage in the future, upon the opening of the site would impact or affect the storage of shielded containers as allowed in the present modification, and that all of the issues in the present appeal had been fully aired before the NMED, and that, therefore, a decision from this Court was warranted.  Further, NMED and DOE expressed their desire for an opinion in the present appeal in order to provide some certainty for planning purposes with respect to the shielded containers in the context of developing plans to reopen the WIPP site.  NMED and DOE also gave assurances that if, during the continuing investigations and analyses of the February 2014 incidents and issues arising out of those incidents, it was determined that any changes required could have an impact on the storage of shielded containers, NMED and DOE would address that as it arose and, if necessary, vacate or amend the relevant permit modification.

**{5}**     This Court required the June 26, 2014, hearing because it was clear that the February 2014 incidents and the ongoing extensive investigations and analyses were a matter of important and ongoing public interest.  After the discussions at the hearing, the Court has determined to address the merits of the issues on appeal.

**{6}**     In the Opinion that follows, we affirm NMED's approval of the permit modification request to allow WIPP to accept shielded containers.  In issuing this Opinion, we point to four important circumstances.  First, when this case was submitted to the Court, the February 2014 incidents had not yet occurred.  The parties have devoted considerable time and expense to this case, which involves issues that may recur concerning the permit modification process.  Second, other than the uncertainty that will not be fully quelled until the numerous investigations into the February 2014 incidents are complete and the conclusions reported, there is nothing before the Court at this time indicating that there will be any changes at WIPP that will impact the issues before this Court. The facts at this point do not indicate that either the fire or the leak was in any way related to a shielded container or its storage at the WIPP site.  Third, based on the statements and representations of NMED and DOE, implementation of changes at WIPP may require a permit modification or

3

modifications that may include necessary material changes concerning the storage of shielded containers. Fourth, regardless, NMED has assured the Court that, as regulations require, it will address any changes that may impact the storage of shielded containers, including whether the permit modification related to shielded containers should be amended, suspended, or revoked.

**MERITS**

**{7}** Appellants Southwest Research and Information Center (Southwest Research) and Margaret Elizabeth Richards appeal a decision by NMED to modify the operating permit for the Waste Isolation Pilot Plant (WIPP or the facility). The modification allows the addition of a shielded container to the facility that, in turn, will allow remote-handled waste to be managed within WIPP under the protocols applicable to contact-handled waste. At issue is whether the permit modification request complied with the applicable regulations and whether NMED appropriately approved the modification under Class 2 procedures that do not require a public hearing, rather than Class 3 procedures that do require a public hearing. We affirm NMED's decision.

**BACKGROUND**

**General Information Regarding WIPP and the Permit**

**{8}** WIPP is an underground repository for defense-related transuranic radioactive waste (waste) near Carlsbad, New Mexico. WIPP was constructed and opened pursuant to the Waste Isolation Pilot Plant Land Withdrawal Act of 1991, Pub. L. No. 102-579, 106 Stat. 4777 (1992), as amended by Pub. L. No. 104-201, 110 Stat. 2422 (1996). WIPP is federally owned and is operated by DOE and a private contractor, Nuclear Waste Partnership LLC (collectively, the Permittees), pursuant to a permit issued in 1999, and modified in 2006, by the Secretary of NMED.

**{9}** The permit is governed by the New Mexico Hazardous Waste Act, NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2010), and the New Mexico Hazardous Waste Management Regulations. *See* § 74-4-3(D), (F) (stating that, in the context of the Hazardous Waste Act, "director" and "secretary" are synonyms meaning the secretary of NMED and "division" or "department" means NMED); *see also* NMSA 1978, § 74-1-8(A)(13) (2000) (stating that the Environmental Improvement Board shall adopt rules applicable to the management of hazardous waste); § 74-4-4(A) (same); 20.4.1.1 to .3 NMAC (6/14/2000) (stating that the hazardous waste management regulations applicable to the storage of hazardous waste were adopted by the Environmental Improvement Board pursuant to the Board's statutory authority). Throughout this Opinion, we refer to the actions of the director or the secretary as those of NMED. The Hazardous Waste Act comports with its federal analog, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 to 6992k (2006), and therefore, NMED is authorized to administer and enforce the state hazardous waste

4

management program under the Hazardous Waste Act in lieu of a federal program.[1]

**{10}** Two categories of waste are stored at WIPP: contact-handled and remote-handled. Contact-handled waste is that with a surface dose rate not greater than 200 millirems per hour, which can be handled manually without personnel protective equipment. *See* Pub. L. No. 102-579, § 2(3), 106 Stat. at 4777 (defining contact-handled waste). WIPP was permitted to and began receiving contact-handled waste in 1999. Remote-handled waste is that with a surface dose rate of 200 millirems per hour or greater, which must be handled remotely using machines. *See* Pub. L. No. 102-579, § 2(12), 106 Stat. at 4778 (defining remote-handled waste). WIPP was permitted to receive remote-handled waste in 2006 and began receiving it in 2007. Contact-handled waste is placed on the floor of the underground disposal rooms, otherwise known as "panels," and remote-handled waste is placed in boreholes in the walls of the panels.

**{11}** The permit limits the total amount of contact-handled and remote-handled waste that can be disposed of at WIPP to 148,500 cubic meters of contact-handled waste and 2,635 cubic meters of remote-handled waste. The permit also limits the amount of each type of waste that can be placed in WIPP's eight respective panels.

**{12}** In March 2011, the United States Environmental Protection Agency (the EPA) announced its decision to approve DOE's request to place a portion of its remote-handled waste in specially designed shielded containers on the floor of the disposal rooms at WIPP rather than in the boreholes. By its letter, the EPA explained that once remote-handled waste was properly loaded into the shielded containers, it may be treated as contact-handled waste. The EPA explained that DOE's request to use the shielded containers was intended to "enhance the efficiency of facility operations[.]" The EPA's letter acknowledged, however, that DOE would "separately need a hazardous waste permit modification from [NMED]" in order to implement its proposed use of the shielded containers at WIPP.

**Permit Modification Requests**

**{13}** Permittees may submit permit modification requests to NMED, and the secretary is charged with issuing a decision thereupon. *See* § 74-4-4.2(D), (G)(2) (stating that "a permit

---

[1]*See* Authorized State hazardous waste programs, 42 U.S.C. § 6926(b) (2006) (authorizing a state to carry out a hazardous waste program in lieu of a federal program provided that, among other things, the state program is equivalent to the federal program); New Mexico; Decision on Final Authorization of State Hazardous Waste Management Program, 50 Fed. Reg. 1515-01, 1515 (Jan. 11, 1985) (granting New Mexico final authorization to operate its hazardous waste management program); State of New Mexico: Final Authorization of State Hazardous Waste Management Program, 55 Fed. Reg. 28,397-01, 28,397 (July 11, 1990) (granting New Mexico final authorization to regulate the mixed waste component).

may be modified at the request of the permittee" and that decision is within the purview of the secretary). Depending on the nature of the intended modification, the modification request will be classified as Class 1, Class 2, or Class 3. *See* Permit modification at the request of the permittee, 40 C.F.R. § 270.42 (2013); 20.4.1.900 NMAC (3/1/2009) (adopting 40 C.F.R Part 270); 20.4.1.901(B)(1) NMAC (3/1/2009) (stating that the secretary may modify a permit pursuant to 40 C.F.R. Part 270). Each class of modification is subject to a specific set of procedures. Class 1 modifications include "routine changes, such as changing typographical errors, upgrading plans and records maintained by the facility, or replacing equipment with functionally equivalent equipment." Permit Modifications for Hazardous Waste Management Facilities, 53 Fed. Reg. 37,912-01, 37,913 (Sept. 28, 1988). "Class 2 modifications address common or frequently occurring changes needed to maintain a facility's capability to manage wastes safely or to conform with new regulatory requirements." *Id.* "Class 3 modifications cover major changes that substantially alter the facility or its operations." *Id.* Class 1 and Class 2 modifications are considered "minor permit modifications[.]" 20.4.1.901(B)(6) NMAC. Class 2 and Class 3 modification procedures are relevant to this appeal.

**{14}** Class 2 modifications and Class 3 modifications have similar initial requirements. *See* 40 C.F.R. § 270.42(b), (c). They both require the permittee to submit a modification request describing the exact change to be made to the permit conditions, identifying the class of the requested modification, explaining why the modification is needed, and providing other materials required by regulations. *See* 40 C.F.R. § 270.42(b)(1), (c)(1). Likewise, among other things, they each require the permittee to give public notice of the modification request that includes the announcement of a sixty-day comment period and announcement of the date, time, and place for a public meeting to be held within the comment period and in the vicinity of the permitted facility. *See* 40 C.F.R. § 270.42(b)(2)-(5), (c)(2)-(5).

**{15}** Within ninety days of a Class 2 request, NMED must take one of five actions on the modification request, that is, NMED, in relevant part, may (1) approve the request (with or without changes), (2) deny the request, or (3) determine that the request must follow the procedures for a Class 3 modification request. 40 C.F.R. § 270.42(b)(6)(i)(A)-(C). The regulations enumerate the following bases upon which NMED may deny or change the terms of a Class 2 permit modification request: (1) "[t]he modification request is incomplete[,]" (2) "[t]he requested modification does not comply with the appropriate . . . requirements[,]" or (3) "[t]he conditions of the modification fail to protect human health and the environment." 40 C.F.R. § 270.42(b)(7). Likewise, the regulations enumerate the following bases upon which NMED may determine that the Class 2 modification request must follow Class 3 procedures: "(1) [t]here is significant public concern about the proposed modification; or (2) [t]he complex nature of the change requires the more extensive procedures of Class 3." 40 C.F.R. § 270.42(b)(6)(i)(C). In making a decision as to a Class 2 modification request, NMED is required to "consider all written comments submitted to [NMED] during the public comment period and must respond in writing to all significant comments in [the] decision." 40 C.F.R. § 270.42(b)(6)(vi).

6

**{16}**    Unlike Class 2 circumstances, in a Class 3 modification request, NMED must give notice and opportunity for a public hearing. *See* § 74-4-4.2(H) (stating that NMED may not rule upon a major modification request without an opportunity for a public hearing); 20.4.1.901(F) NMAC (governing public hearings). A public hearing is an adversarial proceeding held before a hearing officer. *See* 20.4.1.901(F) NMAC. The public hearing must be held within the sixty-day comment period. *See* 40 C.F.R. § 270.42(c)(4); Public hearings, 40 C.F.R. § 124.12(c) (2000). "After the conclusion of the [sixty]-day comment period, [NMED] must grant or deny the permit modification request according to the permit modification procedures of 40 C.F.R. Part 124[.]" 40 C.F.R. § 270.42(c)(6). Additionally, in a Class 3 modification request, NMED must "consider and respond to all significant written comments received during the [sixty]-day comment period." *Id.*

**The September 2011 Modification Request**

**{17}**    On September 29, 2011, the Permittees submitted a Class 2 permit modification request to NMED seeking to implement use of the shielded containers at WIPP. In an overview of the modification request, the Permittees described the requested change, in relevant part, as one to add "a new gamma shielded container for managing remote-handled . . . waste as contact[-]handled . . . waste since it meets the surface dose rate of [contact-handled] . . . waste[.]" In response to the permit modification request, Southwest Research and a number of members of the public responded by sending letters to NMED expressing concern about the proposed use of shielded containers and requesting that the modification be considered a Class 3 modification request instead of a Class 2 modification request.

**{18}**    By a December 22, 2011, letter, NMED notified the Permittees that it was "appropriate for [NMED] to process the modification request as a Class 3 permit modification" because there was substantial public concern about the requested modification and because the complex nature of the changes required the more extensive Class 3 procedures. But in a December 28, 2011, letter, NMED retracted the December 22, 2011, letter and then, by a letter dated January 31, 2012, NMED issued a decision in which, among other things, it denied the request to add provisions for shielded containers. The denial, which will be discussed in greater detail as necessary later in this Opinion, was based primarily on the deficiencies and "technical inadequacies" in the modification request.

**The July 2012 Modification Request**

**{19}**    On July 5, 2012, the Permittees submitted a new Class 2 permit modification request for the addition of the shielded containers. The modification request was subject to a sixty-day public comment period that ran from July 12, 2012, through September 10, 2012. The Permittees held public meetings on the proposed modification on August 14 and 16, 2012. NMED received 206 comments from the public, including one from Southwest Research; nearly all of the letters requested a public hearing. By a "final determination" letter dated November 1, 2012, NMED approved, with changes not at issue in this appeal, the requested Class 2 permit modification. This appeal followed.

**{20}** Appellants raise eight points on appeal in support of two overarching arguments. First, Appellants argue that, for a number of reasons, the permit modification request did not comply with the applicable regulations, and therefore, it could not lawfully be granted by NMED. Second, Appellants argue that approval was improper under Class 2 procedures and should instead have been determined under Class 3 procedures. DOE intervened and argues in support of NMED's decision. We conclude that Appellants' arguments provide no basis for reversal and affirm NMED's approval of the permit modification.

**DISCUSSION**

**Standard of Review**

**{21}** This Court may set aside the Secretary's decision if it is arbitrary and capricious or an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with the law. Section 74-4-14(C). "The burden is on the parties challenging the agency order to make this showing." *N.M. Attorney Gen. v. N.M. Pub. Regulation Comm'n*, 2013-NMSC-042, ¶ 9, 309 P.3d 89 (internal quotation marks and citation omitted). In seven of their eight points, Appellants argue that the Secretary's decision was arbitrary and capricious. "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2005-NMCA-139, ¶ 16, 138 N.M. 625, 124 P.3d 1164 (internal quotation marks and citation omitted). In their final point, Appellants argue that NMED abused its discretion. "An agency . . . abuses its discretion when its decision is contrary to logic and reason." *Oil Transp. Co. v. N.M. State Corp. Comm'n*, 1990-NMSC-072, ¶ 25, 110 N.M. 568, 798 P.2d 169. The appellate courts generally accord deference to an agency's determination of a factual matter within its specialized expertise and do not substitute judgment for that of the agency. *Plains Elec. Generation & Transmission Coop., Inc. v. N.M. Pub. Util. Comm'n*, 1998-NMSC-038, ¶ 7, 126 N.M. 152, 967 P.2d 827.

**I.    Appellants' Arguments Regarding the Modification Request's  Compliance With the Applicable Regulations**

**{22}** Appellants raise five points in support of their position that the modification request did not meet the requirements of the applicable regulations. We consider each in turn and conclude that none of the five points demonstrates a basis for reversal of NMED's decision.

**A.    The Need for the Proposed Modification**

**{23}** Pursuant to 40 C.F.R. § 270.42(b)(1)(iii), a Class 2 modification request must explain why the modification is needed. Although the Permittees provided a "need" statement in their modification request, Appellants fault the Permittees for not having honestly stated the need for the modification and fault NMED for not having determined or recognized for itself what Appellants believe to be the unstated actual need that the modification serves. Because

8

NMED granted the modification request notwithstanding the alleged deficiency in the need statement, Appellants request reversal on the basis that NMED's decision was arbitrary and capricious.

**{24}** In their modification request, the Permittees identified three reasons for the need to add shielded containers as acceptable waste containers at WIPP. Summarized, those reasons were (1) the need to accommodate generator sites' use of shielded containers, (2) to increase the efficiency of the shipment of remote-handled waste, and (3) to increase the efficiency with which remote-handled waste is managed, processed, and handled at WIPP. According to the Permittees' modification request, generator sites[2] were turning to the use of shielded containers because the containers were "expected to reduce the time and personnel necessary for the packaging of" remote-handled waste at generator sites. Additionally, shipping remote-handled waste in shielded containers would permit three times the amount of waste per shipment than remote-handled waste in non-shielded containers. And, in terms of the waste processing time, use of the shielded containers, which allow the remote-handled waste to be handled as contact-handled waste, "is inherently less complex" than handling it as remote-handled waste. Thus, for example, the Permittees explained that a pallet of shielded containers "can be managed from unloading to disposal in about two hours versus the eight to ten hours needed for" handling remote-handled waste in a non-shielded container. The Permittees also stated that, in terms of the remote-handled waste disposal limits, the remote-handled waste stored in the shielded containers would be characterized as, and count against, the limits applicable to remote-handled waste. NMED argues that the Permittees' explanation of the need to use shielded containers at WIPP, which was certified to be "true, accurate, and complete," constituted substantial evidence supporting the need for modification.

**{25}** Appellants argue that, contrary to the reasons stated in the modification request, the real and unstated reason that the Permittees needed the modification was to make up for their earlier inefficient use of remote-handled storage capacity at WIPP. Appellants argue that Permittees placed contact-handled waste in Panels 1 through 3 prior to their receipt of any remote-handled waste, which resulted in a lost opportunity to place any remote-handled waste in boreholes in those panels because remote-handled waste must be placed first. They also argue that Permittees underused the borehole capacity in Panels 4 and 5[3]. Because shielded containers will allow placement of remote-handled waste on panel floors, the real need to use them, according to Appellants, stems from the lost capacity to store remote-

---

[2]Generator sites are places from which the waste originates; waste is originally placed in containers at these sites.

[3]Panel 4 has a maximum capacity for 356 cubic meters of remote-handled waste, but has a final waste volume of 176 cubic meters of remote-handled waste. Panel 5 has a maximum capacity for 445 cubic meters of remote-handled waste, but has a final waste volume of 235 cubic meters of remote-handled waste.

handled waste within the unused or underused boreholes of Panels 1 through 5.

**{26}** Appellants' argument regarding an ulterior reason behind the Permittees' need for modifying the permit to allow the use of shielded containers is speculative and not clearly supported by evidence in the record. At most, Appellants' argument illustrates a possible advantage the Permittees will gain from using the shielded containers, but we are not persuaded that it illuminates an ulterior motive by the Permittees for the requested modification. NMED determined that the Permittees' statement of need was justified by the reasons stated, substantiated by data, and constituted an "adequate statement" of the need. And Appellants have not demonstrated otherwise. *See N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 9 (stating that the appellant bears the burden of demonstrating reversible error in the agency's decision).

**{27}** Appellants also argue that the use of shielded containers could violate the panel limits on remote-handled waste. Appellants tie this argument to a separate issue—whether the use of shielded containers will allow the Permittees to exceed the permitted limit of remote-handled waste that may be stored at WIPP. Appellants argue that NMED reverses itself in stating that the remote-handled waste limits do not apply to remote-handled waste in shielded containers because those containers constitute contact-handled waste. But Appellants' argument confuses NMED's position regarding the limit of remote-handled waste that WIPP may receive with its position regarding the management of remote-handled waste in shielded containers by the Permittees.

**{28}** At the crux of this issue is the distinction between designating waste as remote-handled or contact-handled for purposes of measuring the amount of waste stored at WIPP versus the waste designation for purposes of managing the waste once it is at WIPP. On the one hand is the limit of remote-handled waste that is permitted to be stored at WIPP. As noted earlier in this Opinion, WIPP is permitted to receive a total of 2,635 cubic meters of remote-handled waste. According to the modified permit, remote-handled waste that is placed in shielded containers will count against the limited volume of remote-handled waste that may be stored at WIPP. Thus, the record does not support Appellants' view that the use of shielded containers provides a loophole through which the Permittees can exceed the overall permitted volume of remote-handled waste stored at WIPP.

**{29}** On the other hand is the management of waste within WIPP. Panels 4 through 8 are designated to store a limited amount of remote-handled and contact-handled waste respectively. For purposes of management and storage within the facility, the designation of waste as remote-handled versus contact-handled is, under the permit and according to federal regulation, determined by the amount of surface radiation or "surface dose rate." *See* Pub. L. No. 102-579, § 2(3), 106 Stat. at 4777 (defining contact-handled waste); Pub. L. No. 102-579, § 2(12), 106 Stat. at 4778 (defining remote-handled waste). Thus, remote-handled waste within a shielded container with a surface dose rate not greater than 200 millirems per hour can be managed by WIPP as contact-handled waste. *See* Pub. L. No. 102-579, § 2(3), 106 Stat. at 4777 (stating that contact-handled waste is that with a surface dose rate not

greater than 200 millirems per hour). In effect, this allows the Permittees to store remote-handled waste within shielded containers on the floors of the panels within the panel limits applicable to contact-handled waste. As explained by NMED, in response to public comments, the limits applicable to each panel will remain unchanged. To the extent that Appellants view the modification request as reflecting an underlying "need" or intention to modify or eliminate remote-handled waste limits, Appellants' view is unsupported by the record and, therefore, is unpersuasive.

**{30}** In sum, NMED concluded that the Permittees adequately stated the need for the modification. And Appellants have not demonstrated that NMED's conclusion in that regard was arbitrary and capricious. *See N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 9 (stating that the appellant bears the burden of demonstrating reversible error in the agency's decision); *Gila Res. Info. Project*, 2005-NMCA-139, ¶ 16 ("A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." (internal quotation marks and citation omitted)). Therefore, this issue provides no basis for reversal.

**B.     Enforcement of the Surface Dose Rate Limits**

**{31}** Appellants argue that the modification request was deficient in that it failed to show how the critical surface dose rate limit for shielded containers would be maintained. On that basis, Appellants argue NMED acted arbitrarily and capriciously under 40 C.F.R. § 270.42(b)(7)(iii) by approving a modification that fails to protect human health and the environment. *See id.* (stating that "[NMED] may deny or change the terms of a Class 2 permit modification" if "[t]he conditions of the modification fail to protect human health and the environment"); *Titus v. City of Albuquerque*, 2011-NMCA-038, ¶ 29, 149 N.M. 556, 252 P.3d 780 (recognizing that use of the term "may" evokes discretion). Further, Appellants argue that NMED acted contrary to 40 C.F.R. § 270.42(b)(6)(vi) by failing "to explain its reasoning in declining to protect against an admitted risk." *See id.* (stating that "[NMED] must consider all written comments submitted to [NMED] during the public comment period and must respond in writing to all significant comments in [the] decision").

**{32}** Appellants assert that the surface dose rate for shielded containers will, on average, be much closer to the 200-millirems-per-hour limit for usual contact-handled waste drums and that the prospect of contents shifting during shipment of the waste to WIPP creates a "serious likelihood" that the shielded containers will exceed that limit. Appellants also assert that the EPA and DOE "recognize that shifting is a serious risk." In support of this argument, Appellants cite a portion of a final draft report titled "Review of DOE Planned Change Request for Shielded Containers for Remote-Handled . . . Waste."

**{33}** The report, prepared for the EPA by an independent contractor, summarized the contractor's "technical review of the shielded container [planned change request]." The report indicates that before the EPA would approve the use of shielded containers, the United States Nuclear Regulatory Commission and the Department of Transportation must approve

11

the shipping container design, and a safety analysis must be prepared by DOE. DOE was allowed, pursuant to applicable regulations, to "self-certify that the shielded container [met] the [applicable] requirements[.]" DOE demonstrated compliance with the requirements by conducting a series of "analyses, tests, and evaluations performed on the shielded container to demonstrate" that the packaging design met relevant requirements.

{34}    Based on its review of DOE's self-certification testing, the EPA submitted several comments to DOE for clarification or resolution. The comments and responses were detailed in the report prepared by the independent contractor. Appellants' argument that the EPA and DOE "recognize that shifting is a serious risk" is based upon one such comment by the EPA.

{35}    In response to a representation by DOE regarding a test used to determine whether significant changes in radiation would result depending on the weight of a particular shipment, the EPA raised two questions. First, the EPA asked why, if DOE had determined that radiation levels did not vary depending on the weight of the shipment, it did not expressly so state. Second, the EPA asked that DOE show where it had addressed movement of point sources of radiation and what actions would have to be taken to prevent such movement. In response to the EPA's comment, DOE stated, in relevant part, that "[i]t is the responsibility of the shipper to ensure that there is adequate bracing within the . . . internal payload container such that the point radiation source doesn't move during transportation to cause a significant increase . . . in the external radiation levels." It further explained that specific loading instructions were provided in a handling and operation manual, and the instructions would be "revised to further instruct the shipper to securely fasten and position contents . . . in a manner to prevent a significant increase in the level of radiation at the external surface of the [shielded containers] as a result of movement during transport." Based on review of DOE's "self-certification activities and responses to EPA comments," the independent contractor concluded that the relevant Department of Transportation requirements were met.

{36}    Subsequently, the EPA announced that it "propose[d] to allow the emplacement of shielded container[s] . . . at WIPP, on the condition that, prior to shipping the shielded containers to WIPP, DOE implement[ed] a consistent complex-wide procedure to ensure that the shielded containers remain below the . . . 200 millirem[s] per hour dose limit for contact-handled waste." This condition was met, and the EPA gave its final approval on August 8, 2011.

{37}    NMED responded to public comments regarding shifting by noting that the EPA's final approval of the use of shielded containers was contingent upon DOE addressing this concern. NMED also explained that shifting was not a serious concern because DOE "generator sites are subject to packaging requirements to minimize any shifting of wastes." Generator sites' shipping requirements include standards requiring the use of specific containers and measurement devices before the waste is placed within any container. Further, NMED argues DOE and its contractors are responsible for adhering to federal regulations applicable to the shipment of waste. Thus, NMED argues there are significant

12

safeguards in place to minimize the risk of shifting.

**{38}** Appellants' citation to the EPA's questions of DOE does not show that the possibility of waste shifting led to an abuse of discretion due to a serious risk to human health and the environment that should have led NMED to deny the permit modification, and Appellants do not cite further evidence or authority in support of that proposition. To the extent that the EPA had questions regarding the possibility of waste shifting during transportation, its final approval of DOE's use of shielded containers indicates that the concern was adequately addressed. We will not assume, without evidence to the contrary, that NMED abused its discretion by not requiring safeguards over and above those applicable to DOE and its contractors in regard to the transportation of shielded containers. In sum, we are unable to conclude that NMED acted arbitrarily or capriciously under 40 C.F.R. § 270.42(b)(7)(iii). *See Gila Res. Info. Project*, 2005-NMCA-139, ¶ 16 (stating the arbitrary and capricious standard); *Oil Transp. Co.*, 1990-NMSC-072, ¶ 25 ("An agency . . . abuses its discretion when its decision is contrary to logic and reason."). Therefore, Appellants' argument in this regard provides no basis for reversal.

## C.      The Permitted Height of Stacked Containers

**{39}** Appellants argue that NMED acted arbitrarily and capriciously under 40 C.F.R. § 270.42(b)(7)(iii) by not adequately restricting the stacking height of shielded containers. *See id.* (granting NMED discretion to deny a modification request when the requested modification "fail[s] to protect human health and the environment"). In support of their argument, Appellants cite a phrase from the modification request in which the Permittees stated that "[i]n order to meet the stacking stability requirements . . ., shielded containers will not be stacked more than two high[.]" And they compare that statement with the modified permit, which states, in relevant part, that "[c]ontainers will be stacked in the best manner to provide stability for the stack (which is up to three containers high) and to make best use of available space." According to Appellants, the parenthetical statement allowing containers to be stacked "up to three containers high" fails to protect human health and the environment because it allows Permittees to stack the containers in an unstable formation.

**{40}** NMED and DOE respond that the permit's requirement that the containers be stacked in "the best manner to provide stability" prohibits unstable stacking. Thus, to the extent that stacking the containers in a two-high stack is to provide the best stability, the Permittees are required by the permit to stack the containers no more than two high. NMED argues further that because "the modified permit expressly forbids the stacking of containers in an unstable manner[,]" the alleged problem identified by Appellants is resolved by the language of the modified permit.

**{41}** Appellants argue that this Court cannot rely on the foregoing explanation provided by NMED because, in response to a public comment regarding the stacking concern, NMED did not expressly state "that a general direction to stack containers 'in the best manner' adequately protects against" unstable stacking. Therefore, according to Appellants, this

13

explanation cannot provide a basis for affirming NMED's decision because it constitutes a "post hoc rationalization" made for the first time on appeal in support of NMED's decision. *See Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 11, 133 N.M. 97, 61 P.3d 806 (recognizing that "courts are not free to accept *post hoc* rationalizations of counsel in support of agency decisions, because a reviewing court must judge propriety of agency action solely on grounds invoked by [the] agency"). We do not find this argument persuasive.

**{42}** The requirement that containers be stacked "in the best manner to provide stability" is stated in the modified permit. The modified permit, including the at-issue stacking-stability requirement, was before NMED when it issued its response to the public's comments. NMED's failure to specifically raise the stacking-stability requirement in response to public comment is not a bar to raising it now since the at-issue language was obviously before NMED when the modified permit was approved, thereby providing a ground on which NMED's approval was based. *Id.* (recognizing that this Court must judge an agency's action on the grounds invoked by the agency). That NMED omitted the stacking-stability requirement explanation from its response to the public comment does not necessarily mean that the later expressed rationalization was post hoc.

**{43}** Based on the requirement in the modified permit that the containers must be stacked in the best manner to provide stability, we cannot say that NMED's approval of the modified permit was arbitrary or capricious. NMED has broad discretion in interpreting the applicable regulations, including 40 C.F.R. § 270.42(b)(7)(iii). *See N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 10 (recognizing that deference is accorded to an agency's interpretation of a regulation that it is charged with administering). That NMED did not exercise its discretion to deny the permit reflects its view that the requirement that the Permittees stack the containers in "the best manner to provide stability" adequately protected human health and the environment. We will not substitute our judgment for that of NMED in this regard. *Plains Elec. Generation & Transmission*, 1998-NMSC-038, ¶ 7 (stating that the appellate courts defer to the agency's decision when reviewing decisions requiring expertise in highly technical areas and that our judgment will not be substituted for that of the agency).

**{44}** Further, we note that in response to a public comment as to the inherent flexibility in the modified permit, NMED emphasized that the up-to-three-high language will allow "the Permittees to develop <u>procedures</u> to determine a stacking height as appropriate depending upon certain containers or combination of containers."

## D.    Overpacking Procedures

**{45}** The term "overpacking" refers to the placement of a damaged container into a larger, intact container to prevent waste from being released into the environment. The permit states that "[s]hielded containers may be overpacked into standard waste box or ten drum overpack." Standard waste boxes and ten drum overpacks are types of containers meeting certain regulatory and design specifications for the storage of waste.

14

**{46}** The permit also enumerates the types of containers used for storing remote-handled and contact-handled waste at WIPP. The permit states that contact-handled "waste containers will be either [fifty-five-gallon] . . . drums singly or arranged into [seven]-packs, [eighty-five-gallon] . . . drums singly or arranged into [four]-packs, 100-[gallon] . . . drums singly or arranged into [three]-packs, ten drum overpacks . . ., standard large box 2s . . ., or [standard waste boxes]." And it states that remote-handled "waste containers include RH TRU Canisters, which are received at WIPP loaded singly in an RH-TRU 72-B cask, shielded containers, which are received in HalfPACTs, and [fifty-five]-gallon drums, which are received in a CNS 10-160B cask."

**{47}** Based on the foregoing, Appellants argue that NMED arbitrarily and capriciously authorized an unlawful practice by approving the modification request because standard waste boxes and ten drum overpack containers that are "authorized only to receive [contact-handled] waste" are "not authorized to contain [remote-handled] waste." Thus, Appellants argue, were a shielded container damaged in a manner that caused it to have a surface dose rate greater than 200 millirems per hour, thus requiring it to be managed as remote-handled waste, the modified permit "contains no lawful procedure to manage" it. Appellants state that "[o]n its face, a [p]ermit provision requiring a damaged shielded container . . . to be overpacked in a container authorized only to contain [contact-handled] waste fails to protect health, safety[,] and the environment and is arbitrary and capricious." (Emphasis omitted.)

**{48}** Appellants' argument in this regard requires examination of two distinct overpacking circumstances. The first is overpacking shielded containers that, although damaged, have a surface dose rate of less than 200 millirems per hour. The second is how the Permittees intend to handle a shielded container with damage that causes the container to have a surface dose rate in excess of 200 millirems per hour. These contingencies were addressed separately in the modification request.

**{49}** In regard to the first contingency, the Permittees stated:

> In the unlikely event that shielded containers have surface contamination or container integrity issues which may require decontamination/repair/patch/overpacking, the Permittees may overpack the shielded container into a standard waste box or ten drum overpack. Because the surface dose rate is less than 200 [millirems per hour], this overpacking will occur in the [contact-handled b]ay . . . and not in the [remote-handled b]ay, consistent with overpacking other containers that are managed and stored as [contact-handled] . . . waste.

In regard to the second contingency, the Permittees stated:

> Even if the damage to the shielded container resulted in a breach of the shielding, it would still be handled in the [contact-handled b]ay in accordance with [the permit's procedure applicable to control of spills or leaking or

15

punctured containers of contact-handled and remote-handled waste] . . . . Facility radiological control programs will dictate how a container breach will be mitigated and may include the use of supplemental shielding, overpacks, or other methods to manage radiological hazards beyond the scope of this [p]ermit.

**{50}**     Thus, contrary to Appellants' argument, the record in this case does not support the conclusion that the Permittees intend to manage damaged shielded containers that meet the definition of remote-handled waste by overpacking them within containers that are only approved to hold contact-handled waste.  Rather, the permit's provision that "[s]hielded containers may be overpacked into standard waste box or ten drum overpack" addresses the manner in which the Permittees may handle damaged shielded containers that meet the definition of contact-handled waste.  Additionally, the permit provides that "[o]verpack containers will be compatible with the hazards of the materials involved."  To the extent that standard waste boxes or ten drum overpacks would not be compatible with the hazards of a damaged shielded container that was classified as remote-handled waste, the permit prohibits overpacking in that manner.

**{51}**     Based on the foregoing, we conclude that the record contradicts Appellants' assertion that "[t]he permit clearly calls for placing [remote-handled] waste in [contact-handled] containers[.]"  Further, Appellants have not shown, by argument or authority, that the Permittees' plan to rely on  radiological control programs to dictate how to mitigate a container breach that causes the shielded containers to have surface dose rate higher than 200 millirems per hour is inadequate.  Accordingly, we do not consider that issue in this appeal. *See N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 9 (recognizing that it is the appellant's burden to demonstrate that an agency's decision should be reversed).

**{52}**     In sum, based on our review of the record, we reject Appellants' argument that NMED authorized an unlawful overpacking practice.  Having reviewed and considered all of the relevant evidence in the record pertaining to the overpacking issue, we are unable to conclude that NMED's decision to grant the modified permit was arbitrary or capricious. *See Gila Res. Info. Project*, 2005-NMCA-139, ¶ 16 ("A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." (internal quotation marks and citation omitted)).

### E.     Breach of Shielded Containers

**{53}**     Appellants' final argument in regard to the adequacy of the modification request concerns the possibility of a breach of the shielded containers.  Before turning to Appellants' argument, and to provide context for our analysis, we review the regulation upon which Appellants' argument is premised.

**{54}**     Title 40 of the Code of Federal Regulations, Section 264.601 governs the environmental performance standards applicable to miscellaneous units, including WIPP.

16

*See* Environmental performance standards, 40 C.F.R. § 264.601 (2006); Definitions, 40 C.F.R. § 260.10 (2014) ("Miscellaneous unit means a hazardous waste management unit where hazardous waste is treated, stored, or disposed of[.]"); 20.4.1.100 NMAC (3/1/2009) (adopting 40 C.F.R. Part 260); 20.4.1.500 NMAC (3/1/2009) (adopting 40 C.F.R. Part 264). Section 264.601 provides, in relevant part, that miscellaneous units "must be located, designed, constructed, operated, maintained, and closed in a manner that will ensure protection of human health and the environment." It further provides that "[p]ermits for miscellaneous units are to contain such terms and provisions as necessary to protect human health and the environment, including, but not limited to . . . design and operating requirements, detection and monitoring requirements, and requirements for responses to releases of hazardous waste or hazardous constituents from the unit." 40 C.F.R. § 264.601. And it enumerates a number of factors to be considered in meeting the foregoing requirements. 40 C.F.R. § 264.601(a)-(c). Section 264.601 in Title 40 of the Code of Federal Regulations does not govern modification requests, which, as as discussed throughout this Opinion, are governed by 40 C.F.R. § 270.42.

**{55}** Appellants argue that NMED's decision arbitrarily and capriciously "disregarded" the terms of 40 C.F.R. § 264.601, which, Appellants state, is the governing regulation. Appellants further argue that NMED acted arbitrarily and capriciously by "revers[ing] itself as to the need for evaluation of the impacts of the proposed modification under" 40 C.F.R. § 264.601. *See* 20.4.1.500 NMAC (adopting 40 C.F.R. Part 264). On these bases, Appellants argue that NMED's decision must be reversed.

**{56}** Pursuant to 40 C.F.R. § 270.42(b)(7)(ii), NMED "may deny or change the terms of a Class 2 permit modification request" if "[t]he requested modification does not comply with the appropriate requirements of 40 C.F.R. Part 264[.]" Thus, whether to deny a modification request on the basis of lack of compliance with 40 C.F.R. § 264.601, is within NMED's discretion. As a factual basis underlying its argument that NMED's action disregarded the terms of 40 C.F.R. § 264.601, Appellants state that had NMED examined the issue of a possible breach of shielded containers, the examination would have revealed the need "to limit the quantity of [remote-handled] waste in shielded containers in areas where [remote-handled] waste was previously barred." Appellants also state that "regardless of the surface dose rate, contents of a shielded container can be far more radioactive than [contact-handled] waste and can have significant quantities of hazardous chemicals, creating significantly larger risks in an accident." Neither of the foregoing assertions of fact is supported by citation to evidence in the record, therefore, they have no bearing on our analysis. *See Muse v. Muse*, 2009-NMCA-003, ¶ 51, 145 N.M. 451, 200 P.3d 104 (stating that assertions of counsel that are unsupported by the record provide no basis for review).

**{57}** As further factual support, Appellants point to Southwest Research's public comment that shielded containers "will likely have external dose rates that are more than an order-of-magnitude greater than the [contact-handled] waste that is normally handled[,]" with which, Appellants contend on appeal, NMED "did not disagree." While NMED did not directly rebuke this comment, it responded by reiterating that:

17

[o]nce the waste is placed in the shielded container and the surface dose rate is no greater than 200 millirem[s] per hour, the waste is then handled as [contact-handled] waste. The permit specifies management of waste in the [contact-handled] waste related areas if the containers in those areas can be managed as [contact-handled] waste.

We read NMED's response to state that even assuming the likelihood that the shielded containers will have higher external dose rates than contact-handled waste, it may be managed safely within the contact-handled waste areas under the permit's protocol provided that its surface dose rate does not exceed 200 millirems per hour.

**{58}** Appellants do not, by argument or evidence in the record, demonstrate that higher external dose rates that they contend are "likely" to be associated with the shielded containers required examination of a possible breach and the consequences thereof of the shielded containers. Nor, in their reply brief do Appellants respond to NMED's arguments regarding the "[i]nnumerable measures to protect public health and the environment, including provisions specifically written to protect public health and the environment from hazards associated with remote-handled . . . waste." *See Delta Automatic Sys., Inc. v. Bingham*, 1999-NMCA-029, ¶ 31, 126 N.M. 717, 974 P.2d 1174 (explaining that failure to respond in a reply brief to arguments raised in an answer brief constitutes a concession of the matter). Among those measures are overpacking shielded containers, as discussed earlier in this Opinion, installation of "[o]ne or more filter vents" in the "shielded container lid to prevent the escape of radioactive particulates and to prevent internal pressurization"; specific protocols applicable to the management, storage, and placement of the shielded containers, and security and radiological checks and shipping documentation reviews of the shielded containers that arrive at WIPP. Having reviewed NMED's citations to evidence in the record pertaining to these safety measures, and having not been presented with argument or evidence in the record demonstrating that they were inadequate, we cannot conclude that NMED abused its discretion by not denying the permit pursuant to 40 C.F.R. § 270.42(b)(7)(ii). *See Oil Transp. Co.*, 1990-NMSC-072, ¶ 25 (stating that an agency's action that is "contrary to logic and reason" constitutes an abuse of discretion).

**{59}** Nor are we persuaded by Appellants' argument that NMED improperly reversed its position when it failed to require an evaluation of the impacts of the proposed modification under 40 C.F.R. § 264.601. Appellants' argument in this regard is premised on the history of the administrative proceedings applicable to the September 29, 2011, modification request, which, although it is not at issue in this appeal, is discussed in the background section of this Opinion to provide a historical overview of the proceedings.[4] Appellants point to NMED's December 22, 2011, letter in which NMED informed the Permittees that

---

[4]As stated in the background section of this Opinion, the present appeal concerns NMED's approval of a subsequent modification request that was filed by the Permittees on July 5, 2012.

their September 29, 2011, modification request would be processed as a Class 3 permit modification.

**{60}** In the December 22, 2011, letter, NMED stated, in relevant part, that "[t]he requested modification would require complex changes to the operation of the facility. . . . [For] example, [NMED] will need to evaluate whether the proposed modification complies with 40 C.F.R § 264.601(c)(6), which addresses the potential for health risks caused by human exposure to waste constituents." Six days later, NMED retracted the December 22 letter. Subsequently, on January 31, 2012, NMED issued its final decision as to the September 29, 2011, modification request, denying the permit modification request to add provisions for shielded containers. The January 31, 2012, letter did not refer to 40 C.F.R. § 264.601 as a basis for its denial. Rather, NMED's denial was based on "technical inadequacies" that could not be corrected by NMED and approved with changes because NMED lacked sufficient information to make the required changes.

**{61}** Appellants cite federal and state case law for the proposition that it is arbitrary and capricious for an agency to change course without explanation, or treat one case differently from another case with similar facts. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-47 (1983) (holding that a federal agency's rescission of part of a federal regulation was arbitrary and capricious where the agency failed to present an adequate basis and explanation for the rescission); *Sais v. N.M. Dep't of Corr.*, 2012-NMSC-009, ¶ 17, 275 P.3d 104 (holding that "[a] worker's termination may be arbitrary and capricious if one employee is treated differently compared with others who are similarly situated and no rational explanation is offered for the difference"). Based on that proposition, Appellants argue that NMED's approval of the modification request in this case without having evaluated whether the proposed modification complies with 40 C.F.R § 264.601(c)(6), in keeping with the December 22, 2011, letter, rendered NMED's decision arbitrary and capricious because NMED "reversed its position on a fundamental issue without explaining its reasons."

**{62}** We do not share Appellants' view that NMED's December 22, 2011, letter, which was rescinded six days after it was issued, and replaced with a letter that did not rely on 40 C.F.R. § 264.601, may be viewed as reflecting NMED's "position on a fundamental issue." At best, the rescinded letter can be said to have reflected NMED's view of the September 29, 2011, modification request which, although it sought to introduce shielded containers to WIPP, suffered from technical inadequacies and insufficient information. As indicated by NMED's approval of the July 5, 2012, modification request, the later request did not reflect the same deficiencies. As such, we cannot conclude that NMED acted arbitrarily and capriciously by treating the respective modification requests differently. *See Sais*, 2012-NMSC-009, ¶¶ 17, 21, 27 (stating that where there is a "meaningful distinction between" the differently decided cases, disparate treatment of them does not constitute an abuse of discretion). In the absence of evidence to the contrary, we conclude that the information contained in the second modification request satisfied the requirements of 40 C.F.R. § 264.601, thus alleviating the need for NMED, in its discretion, to deny the modification

request pursuant to that regulation. *See* 40 C.F.R. § 270.42(b)(7)(ii) (stating that NMED "may deny or change the terms of a Class 2 permit modification request" if "[t]he requested modification does not comply with the appropriate requirements of 40 C.F.R. Part 264"); *Plains Elec. Generation & Transmission*, 1998-NMSC-038, ¶ 7 (stating that the reviewing court defers to the agency's decisions when reviewing decisions requiring expertise in highly technical areas and will not substitute our judgment for that of the agency).

## II. Appellants' Arguments Regarding the Need for Class 3 Instead of Class 2 Proceedings

{63}   In their remaining arguments, Appellants raise three points, in each of which Appellants urge reversal of NMED's decision that was rendered pursuant to Class 2 procedures and a remand of this case for Class 3 proceedings. We consider each of Appellants' three points in turn. And we conclude that none provides a basis for reversal.

## A.   Storage Capacity

{64}   Appellants' first argument regarding the need for Class 3 instead of Class 2 proceedings stems from the regulatory requirement that a modification request that will result "in greater than [a twenty-five percent] increase in the facility's container storage capacity" requires Class 3 proceedings. *See* 40 C.F.R. app. § 270.42(F)(1)(a) (2008) (Classification of Permit Modification). Appellants argue that the modification request increases WIPP's storage capacity for remote-handled waste by allowing the waste to be stored in areas that were previously limited to the storage of contact-handled waste. Thus, according to Appellants, NMED's decision was arbitrary and capricious because it disregarded the terms of "the governing regulation." *See* § 74-4-14(A), (C)(3) (stating that we may reverse NMED's decision if it is "not in accordance with law"). Appellants' argument is not supported by the applicable regulation or by evidence in the record.

{65}   The applicable regulation requires Class 3 proceedings under circumstances in which the facility's "container storage capacity" will be increased by more than twenty-five percent. 40 C.F.R. app. § 270.42(F)(1)(a). On its face, 40 C.F.R. app. § 270.42(F)(1)(a) does not distinguish between the capacity of a facility to store remote-handled waste versus contact-handled waste, and Appellants provide no authority to support reading such a distinction into the regulation. Appellants do not point to any evidence in the record indicating that, owing to the use of shielded containers, WIPP will have any increase in storage capacity, much less a twenty-five percent or greater increase, nor have we found any evidence in the record to support such a conclusion. As such, Appellants have not demonstrated that NMED acted arbitrarily or capriciously or that it improperly disregarded 40 C.F.R. app. § 270.42(F)(1)(a).

{66}   Furthermore, to be clear, the volume of the shielded containers counts toward the limit of remote-handled waste that may be shipped to and stored within WIPP. In terms of WIPP's ability to manage its limited volume of remote-handled waste, the shielded

containers have the effect of increasing the areas of WIPP where remote-handled waste can be stored. That is, rather than storing the remote-handled waste exclusively within the panel boreholes, the Permittees may, under the modified permit, store remote-handled waste in shielded containers on the panel floors. Yet, there is no evidence in the record to support a view that the Permittees' ability to use the space differently will increase WIPP's storage capacity by more than twenty-five percent. Without evidence to support it, Appellants' argument in this regard provides no basis for reversal.

**B.      Waste Management Practices**

**{67}**      Appellants argue that Class 3 procedures were required because the use of shielded containers constitutes "[s]torage of different wastes in containers . . . [t]hat require additional or different management practices from those authorized in the permit[.]" 40 C.F.R. app. § 270.42(F)(3)(a); *see* 20.4.1.900 NMAC (adopting 40 C.F.R. Part 270). Appellants argue that NMED arbitrarily and capriciously disregarded the terms of the federal regulation by authorizing the use of shielded containers under a Class 2 modification. Additionally, relying on NMED's January 31, 2012, denial letter, Appellants argue that NMED acted arbitrarily or capriciously by changing its position on the issue whether, pursuant to 40 C.F.R. app. § 270.42(F)(3)(a), Class 3 procedures were required to modify the permit to allow the use of shielded containers at WIPP.

**{68}**      The term "different wastes" as used in 40 C.F.R. app. § 270.42(F)(3)(a) refers to a circumstance in which "the facility may be seeking to accept wastes that were not previously identified in the permit, or it may already be managing the waste but would prefer to shift it to a different treatment, storage, or disposal process." 53 Fed. Reg. at 37,927. Permit modifications to allow different wastes follow either Class 2 or Class 3 procedures. *Id.*

**{69}**      Class 2 procedures apply in circumstances in which the "different wastes . . . are sufficiently similar to wastes currently authorized at the unit so that no additional or different management practice, design, or process is required." *Id.* For "example, a unit may be permitted only to treat specific solvent wastes, but may be equally capable of treating other solvent wastes that exhibit similar physical and chemical properties within the same management conditions of the permit." *Id.* Class 3 procedures apply in circumstances in which "the introduction of a different waste . . . will require different or additional management practices, design, or processes to properly manage the waste—for instance, if the waste is reactive or ignitable—and the permit . . . does not anticipate that such wastes will be managed in the unit." *Id.* In the context of WIPP, the term "unit" means the eight underground disposal units referred to throughout this Opinion and in the permit as "panels."

**{70}**      Appellants argue that Class 3 procedures were required because the Permittees stated in their modification request that "[t]he shielded container will contain hazardous waste already approved for disposal at the WIPP facility; however, that waste ([remote-handled waste]) is approved for management in the [remote-handled c]omplex and not in the [contact-handled b]ay, and therefore, . . . it is a different waste in a particular unit."

21

Appellants characterize the foregoing as a concession by the Permittees that Class 3 procedures were required; however, the Permittees' acknowledgment of the fact that the modification includes "different waste in a particular unit" is not dispositive. As indicated, in the preceding paragraph, "different waste" may lead to Class 2 or Class 3 procedures; the determining factor is whether "additional or different management practices from those authorized in the permit" are required. *See* 40 C.F.R. app. § 270.42(F)(3). Following the "different waste" statement, the modification request continued, providing the following relevant explanation of why Class 2 procedures were applicable here.

> In this modification, the Permittees are proposing to manage hazardous waste that is defined as [remote-handled] waste by the generator in the [contact-handled] waste management areas by using the shielded container. Because [the remote-handled] waste has not been managed and stored in the [contact-handled] portion of the facility, the Permittees consider this Class 2 [permit modification request] as the appropriate modification request to authorize this activity. Since modification of the facility is not needed, and the imposition of different waste management practices is not needed, this modification is not classified as a Class 3 [p]ermit [m]odification. This is because the management of [remote-handled] waste in shielded containers can be done using existing [contact-handled] waste practices in the [contact-handled] portion of the facility.

{71}	Appellants argue that, contrary to the Permittees' statement, different management practices are, in fact, required with the addition of shielded containers. Appellants identify what they believe to be six management practices that are different from those in the permit: (1) "[t]he shielded container itself is 'a new payload container' with layers of lead and steel, weighing nearly a ton"; (2) "[m]anagement of [remote-handled] waste in shielded containers requires shielded-container-specific 'packaging requirements to minimize shifting' "; (3) "[t]he [three]-pack package contains numerous elements not used in shipping [contact-handled] waste and is managed differently from [contact-handled] waste shipments"; (4) "[i]n [the] event of contamination or release from a shielded container, the [three]-pack must be disassembled for overpacking"; (5) "[a] still-unknown, but shielded-container-specific, overpacking method must contain the intense radiation from [remote-handled] waste"; and (6) "[a] still-unknown, but shielded-container-specific, stacking system will be used in [placing] shielded containers in the underground." Appellants' fifth and sixth points are not accompanied by authority, evidence, or citations to the record proper and will not be considered.

{72}	Appellants' first through fourth management-practices points are not supported by the record. As to Appellants' first point, we do not believe, and Appellants do not show by argument, authority, or evidence in the record, how their recitation of the shielded containers' weight and composition may be considered a "management practice" or otherwise requires a new management practice. Concerning Appellants' second point, that shielded containers are subject to particular packaging requirements, Appellants provide no

record support for their view that this affects management practices or requires new management practices at WIPP. To the contrary, the record reflects that the shielded-container-specific packaging requirements govern the generator sites where the packaging will occur. As to Appellants' third point, contrary to their argument that the shielded containers must be managed differently from contact-handled waste, the record reflects that shielded containers do not need to be managed differently from contact-handled waste; rather, they may be managed using contact-handled waste equipment and operating procedures. Finally, as to Appellants' fourth point, NMED argues and the record reflects that the modification request does not require a new management practice; rather, it provides that a damaged shielded container may be managed according to the existing permit requirements.

**{73}** In sum, Appellants' argument in regard to the different management practices is not supported by the record. Because Appellants have not shown by argument or evidence in the record that NMED contravened 40 C.F.R. app. § 270.42(F)(3) in approving the modification request, we cannot say that NMED's decision was arbitrary or capricious. *See N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 9 (recognizing that it is the appellant's burden to demonstrate that an agency's decision should be reversed); *Gila Res. Info. Project*, 2005-NMCA-139, ¶ 16 ("A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." (internal quotation marks and citation omitted)).

**{74}** Nor are we persuaded by Appellants' argument that, in light of NMED's January 31, 2012, denial letter, we should conclude that NMED acted arbitrarily or capriciously by changing its position on the issue whether, pursuant to 40 C.F.R. app. § 270.42(F)(3)(a), Class 3 procedures were required in this case. In contrast to the September 29, 2011, modification request that provided a sparse and conclusory statement as to why the modification request should follow Class 2 procedures, in their July 5, 2012, modification request the Permittees provided two full pages explaining why the modification request required Class 2 procedures. Among other things, as indicated earlier, the Permittees addressed the issue whether different waste management practices were required, concluding that they were not. Appellants have not demonstrated that NMED erred in agreeing with the Permittees in this regard. *See N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 9 (recognizing that it is the appellant's burden to demonstrate that an agency's decision should be reversed). Moreover, as we have noted, owing to the difference in the respective modification requests, we do not believe that comparing NMED's responses to them demonstrates that NMED acted arbitrarily and capriciously. *See Sais*, 2012-NMSC-009, ¶¶ 17, 21, 27 (stating that where there is a "meaningful distinction between" the differently decided cases, disparate treatment of them does not constitute an abuse of discretion).

## C. Public Concern

**{75}** As indicated earlier in this Opinion, in making a decision as to a Class 2 modification request, NMED is required to consider all written comments submitted to NMED during the

public comment period and must respond in writing to all significant comments in the decision. 40 C.F.R. § 270.42(b)(6)(vi). NMED points to the fact that of the 206 comments that it received, 173 were pre-printed form letters containing "very little substance[,]" sixteen were copies, or near copies, of the form letters, twelve "were similarly lacking in substance[,]" and only two organizations, Southwest Research and Nuclear Watch New Mexico, provided substantive comments. Thus, NMED argues, notwithstanding the volume of letters it received, the substance of the public's concern was fairly limited. NMED further argues that it carefully considered the public comments it received and responded thereto in writing, as evidenced by its explanatory written responses contained in the record. NMED determined that in light of the fact that it held public meetings on the modification request and addressed the public comments in writing, a public hearing was not required.

**{76}** Appellants argue that NMED abused its discretion by failing to require Class 3 procedures pursuant to 40 C.F.R. § 270.42(b)(6)(i)(C)(1), which provides that "significant public concern about the proposed modification" is a basis upon which NMED may determine that the modification must follow Class 3 procedures. Appellants' argument in this regard is supported exclusively by the number of letters sent to NMED during the comment period. Appellants argue that in NMED's December 22, 2011, letter pertaining to the September 29, 2011, modification request, NMED stated that "more than [eighty] public comments indicated substantial public concern, requiring Class 3 procedures[.]" Whereas, Appellants contend, in this case, where "200 citizens express[ed] the need for a public hearing" as to the July 5, 2012, modification request, NMED, acting contrary to logic and reason, found "a lack of public concern[.]"

**{77}** In regard to this argument, as in regard to others that we have already discussed, we do not find Appellants' reliance on NMED's December 22, 2011, letter that did not pertain to the present modification request and that was retracted six days after it was issued, persuasive. In NMED's January 31, 2012, final decision on the matter of the September 29, 2011, modification request, technical inadequacies, rather than public concern over the use of shielded containers or the need for a public hearing, was the basis for denying the modification request. Furthermore, without evidence to the contrary, we assume that the public's concern, like that of NMED, reflected the technical and informational inadequacies of the September 29, 2011 modification request. We do not conclude that the views expressed in NMED's later-retracted December 22, 2011, letter, which was written in response to a technically inadequate modification request, is informative or persuasive in regard to NMED's decision in regard to the present modification request.

**{78}** Although we recognize that issues surrounding WIPP and modifications to the permit are of general public interest and concern owing to the health and environmental implications of waste storage within our state, Appellants have not demonstrated that NMED abused its discretion by acting contrary to or ignoring the public interest and concern in processing the modification request under Class 2 procedures. Short of a generalized reiteration of the issues raised throughout their briefs, and addressed earlier in this Opinion, Appellants do not demonstrate that NMED failed to adequately address the public's specific

24

concerns here by NMED's written responses to the public comments. *N.M. Attorney Gen.*, 2013-NMSC-042, ¶ 9 (recognizing that it is the appellant's burden to demonstrate that an agency's decision should be reversed). Nor do Appellants demonstrate, by argument, evidence, or authority, what could have or should have been raised and addressed in a public hearing that was not addressed in NMED's written responses to the public's comments. *See Sw. Research & Info. Ctr. v. N.M. Env't Dep't*, 2003-NMCA-012, ¶ 39, 133 N.M. 179, 62 P.3d 270 (recognizing that "there is great public interest in the WIPP facility in general" but holding that this "does not mean that there must be a hearing for every administrative detail concerning the facility"). Under the circumstances of this case, we are unable to conclude on the issue of public concern that NMED abused its discretion by declining to process the modification request under Class 3 rather than Class 2 procedures. *See Oil Transp. Co.*, 1990-NMSC-072, ¶ 25 (stating the abuse of discretion standard).

**CONCLUSION**

**{79}** Based on our review of the record in this case, we are not persuaded that NMED erred in approving the July 5, 2012, modification request to permit the addition of shielded containers at WIPP. We affirm NMED's approval of the permit modification.

**{80}     IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**


**WE CONCUR:**


_____
**JAMES J. WECHSLER, Judge**


_____
**LINDA M. VANZI, Judge**